40 P.3d 946

**OKADA TRUCKING CO., LTD.,**
Petitioner–Appellee,

v.

**BOARD OF WATER SUPPLY, City and County of Honolulu, Respondent–Appellee,**

and

**Inter Island Environmental Services, Inc., Intervenor–Respondent–Appellant.**

No. 22956.

Intermediate Court of Appeals of Hawai'i.

March 20, 2001.

Reconsideration Granted April 2, 2001.

Certiorari Granted May 21, 2001.

Darryl H.W. Johnston, David F.E. Banks, and Marc E. Rousseau, Honolulu, (Cades Schutte Fleming & Wright), for intervenor-respondent-appellant.

James E.T. Koshiba and Neal K. Aoki, Honolulu, (Koshiba Agena & Kubota), for petitioner-appellee.

BURNS, C.J., WATANABE, and FOLEY, JJ.

## OPINION OF THE COURT BY WATANABE, J.

This case stems from a protest by Petitioner-Appellee Okada Trucking Co., Ltd. (Okada), challenging the award of a contract for the construction and installation of the Kaluanui Booster Station, Phase II (the Project) by Respondent-Appellee Board of Water Supply, City and County of Honolulu (BWS) to Intervenor-Respondent-Appellant Inter Island Environmental Services, Inc.[1] (Inter Island). The grounds of Okada's protest were that Inter Island, in violation of statutes, rules, and bid documents, failed to identify in its bid the names of joint contractors or subcontractors (collectively, "subcontractors") who possessed the specialty licenses allegedly required for performance of the plumbing, reinforcing steel, and roofing work under the contract.

On November 10, 1999, following a *de novo* administrative review requested by Okada, a hearings officer with the Office of Administrative Hearings, Department of Commerce and Consumer Affairs, State of Hawai'i (DCCA) issued Findings of Fact, Conclusions of Law and Decision (Decision), concluding that: (1) Inter Island was not a responsible bidder because it did not have, at the time of bid opening, a properly licensed plumbing subcontractor "lined up" to perform the portions of the work for the Project that allegedly required a plumbing contractor's license;

---

1. It is not clear what the legal name for Intervenor-Respondent-Appellant is. Throughout the record on appeal, its name is spelled sometimes as "Inter-Island Environmental Services, Inc." and sometimes as "Inter Island Environmental Services, Inc." Since the official caption for this case refers to the corporation as "Inter Island Environmental Services, Inc." (without a hyphen), we will refer to the corporation in this opinion as "Inter Island."

(2) Inter Island's bid was non-responsive because, in violation of the subcontractor listing requirement imposed by Hawai'i Revised Statutes (HRS) § 103D–302(b) (Supp.2000) and Hawai'i Administrative Rules (HAR) § 3–122–21(a)(8), Inter Island failed to list the names of the subcontractors who would be performing work under the contract in three areas (plumbing, reinforcing steel, and roofing) that allegedly required specialty contractor licenses; and (3) although BWS was authorized to waive Inter Island's failure to list a reinforcing steel and roofing subcontractor, BWS violated the Hawai'i Public Procurement Code (the Procurement Code) set forth in HRS chapter 103D, as well as the administrative rules promulgated to implement the Procurement Code, HAR Title 3, subtitle 11, chapter 120, when it waived Inter Island's failure to list a plumbing subcontractor [2] and awarded the contract to Inter Island.

Accordingly, the hearings officer ordered that BWS's contract award to Inter Island be terminated and that Inter Island be compensated for actual expenses reasonably incurred under the contract, plus a reasonable profit based upon its performance of the contract up to the time of termination. Inter Island thereafter sought appellate judicial review.

2. Petitioner–Appellee Okada Trucking Co., Ltd. (Okada) did not seek judicial review of the hearings officer's determination that Respondent–Appellee Board of Water Supply, City and County of Honolulu (BWS) was authorized to waive the failure of Intervenor–Respondent–Appellant Inter Island Environmental Services, Inc. (Inter Island) to list the joint contractors or subcontractors (collectively, "subcontractors") that Inter Island intended to use for the reinforcing steel and roofing work, if it were awarded the contract. Therefore, the only issues before us for judicial review relate to Inter Island's failure to list a subcontractor with a specialty plumbing contractor's license.

3. Hawai'i Revised Statutes (HRS) § 103D–302(b) (Supp.2000), which has not changed in language since the Invitation for Bids (IFB) was issued by BWS, states as follows:

An invitation for bids shall be issued, and shall include a purchase description and all contractual terms and conditions applicable to the procurement. If the invitation for bids is for construction, it shall specify that all bids in-

We conclude that the hearings officer's Decision that Inter Island was neither a responsible nor responsive bidder was premised on an erroneous determination that Inter Island was required to engage properly licensed plumbing, reinforcing steel, and roofing subcontractors in order to perform the contract in question. Therefore, the hearings officer should not have ordered BWS to terminate its contract award to Inter Island. However, since Inter Island, in its application for judicial review, failed to challenge that determination, we decline to grant Inter Island's request that we reinstate BWS's award of the contract to Inter Island.

## BACKGROUND

### A. The Invitation for Bids

On or about May 6, 1999, BWS issued an Invitation for Bids (IFB), seeking sealed bids for the Project. As required by HRS § 103D–302 (Supp.2000),[3] the IFB instructed prospective bidders that they were required to list, on a form included in the IFB, each subcontractor to be engaged by the prospective bidder in the performance of the contract for the Project. Prospective bidders were also notified that they had to be licensed to undertake the Project, pursuant to HRS chapter 444, relating to the licensing of contractors and were required to hold a current "A" General Engineering Contractor license [4] from the State of Hawai'i.

clude the name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the contract and the nature and scope of the work to be performed by each. Construction bids that do not comply with this requirement may be accepted if acceptance is in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is equal to or less than one per cent of the total bid amount.

4. HRS § 444–7 (1993) defines the classifications of contractors as follows:

Classification. (a) For the purpose of classification, the contracting business includes any or all of the following branches:
(1) General engineering contracting;
(2) General building contracting;
(3) Specialty contracting.
(b) A general engineering contractor is a contractor whose principal contracting business is in connection with fixed works requiring specialized engineering knowledge and skill, including

## B. *The Bid Opening*

On June 10, 1999, BWS opened the nine sealed bids that had been submitted for the Project. Inter Island was determined to be the lowest bidder, with a bid of $1,349,160. Okada was the second lowest bidder, with a bid of $1,375,000.

It is undisputed that Inter Island is a licensed "A" general engineering contractor, as required by the IFB. Inter Island also holds a "B" general building contractor li-

the following divisions or subjects: irrigation, drainage, water power, water supply, flood control, inland waterways, harbors, docks and wharves, shipyards and ports, dams and hydroelectric projects, levees, river control and reclamation works, railroads, highways, streets and roads, tunnels, airports and airways, sewers and sewage disposal plants and systems, waste reduction plants, bridges, overpasses, underpasses and other similar works, pipelines and other systems for the transmission of petroleum and other liquid or gaseous substances, parks, playgrounds and other recreational works, refineries, chemical plants and similar industrial plants requiring specialized engineering knowledge and skill, powerhouses, power plants and other utility plants and installations, mines and metallurgical plants, land levelling and earth-moving projects, excavating, grading, trenching, paving and surfacing work and cement and concrete works in connection with the above mentioned fixed works.

(c) A general building contractor is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof.

(d) A specialty contractor is a contractor whose operations as such are the performance of construction work requiring special skill such as, but not limited to, electrical, drywall, painting and decorating, landscaping, flooring, carpet laying by any installation method, plumbing, or roofing work, and others whose principal contracting business involves the use of specialized building trades or crafts.

Hawai'i Administrative Rules (HAR) § 16–77–32 further explains the scope of the classifications:

*General engineering, general building, and specialty contractors.* (a) Licensees who hold the "A" general engineering contractor classification shall automatically hold the following specialty classifications without further examination or paying additional fees:

(1) C–3 asphalt paving and surfacing;
(2) C–9 cesspool;
(3) C–17 excavating, grading, and trenching;

cense and "C" contractor licenses in the following specialty classifications: C–13 (electrical contractor) and C–27 (landscape contractor). Pursuant to HAR § 16–77–32(d),[5] Inter Island, by virtue of its C–13 and C–27 licenses, automatically held licenses in all subclassifications of the C–13 and C–27 specialty classifications. Additionally, pursuant to HAR § 16–77–32(a) and (c),[6] Inter Island, by virtue of its "A" and "B" licenses, automatically held "C" licenses in a number of specialty classifications.

(4) C–24 building moving and wrecking;
(5) C–31a cement concrete;
(6) C–32 ornamental guardrail and fencing;
(7) C–35 pile driving, pile and caisson drilling, and foundation;
(8) C–37a sewer and drain line;
(9) C–37b irrigation and lawn sprinkler systems;
(10) C–38 post tensioning;
(11) C–43 sewer, sewage disposal, drain, and pipe laying;
(12) C–49 swimming pool;
(13) C–56 welding;
(14) C–57a pumps installation;
(15) C–57b injection well;
(16) C–61 solar energy systems.

(b) The "A" general engineering contractor may also install poles in all new pole lines and replace poles, provided that installation of the ground wire, insulators, and conductors are performed by a contractor holding the C–62 pole and line classification. The "A" general engineering contractor may also install duct lines, provided that installation of conductors is performed by a contractor holding the C–13 classification.

(c) Licensees who hold the "B" general building contractor classification shall automatically hold the following specialty classifications without further examination or paying additional fees:

(1) C–5 cabinet, millwork, and carpentry remodelling and repairs;
(2) C–6 carpentry framing;
(3) C–12 drywall;
(4) C–24 building moving and wrecking;
(5) C–25 institutional and commercial equipment;
(6) C–42a aluminum shingles;
(7) C–42b wood shingles and shakes.

(d) Licensees who hold a specialty contractors license shall automatically hold the subclassifications of the licensee's particular specialty without examination or paying additional fees.

**5.** See footnote 4 for text of this rule.

**6.** See footnote 4 for text of these rules.

The Special Provisions of the IFB specifically required that all "[r]estoration of pavements" work under the contract "shall be done by a contractor holding a current *C–3— ASPHALT PAVING AND SURFACING CONTRACTOR* specialty license for the State of Hawaii [Hawai'i.]" Additionally, the Special Provisions included the following requirement:

All construction contract bids involving any chlorination work shall have a name listed for the C–37d Water Chlorination Subcontractor. Any bid not listing this subcontractor shall be rejected and disqualified. However, where the value of the work to be performed by the subcontractor is equal to or less than one percent of the total bid amount, the listing of the subcontractor

may be waived if it is in the best interest of [BWS].

In its bid, Inter Island, as required by the Special Provisions, listed subcontractors who possessed specialty contractor licenses in the "C–3" (asphalt paving and surfacing) and "C–37d" (water chlorination) classifications and subclassifications. Inter Island also designated a "C–33" (painting and decorating) subcontractor. However, Inter Island did not list any subcontractors who possessed a "C–37" license in plumbing,[7] a "C–41" license in reinforcing steel,[8] and a "C–42" license in roofing.[9] Our review of the record indicates that the other eight bidders did list subcontractors with "C–41" and "C–42" licenses. However, of the nine bidders, only three listed a "C–37" plumbing subcontractor. Moreover, even Okada did *not* name a "C–37" plumbing contractor.[10]

7. Title 16, Chapter 77 of the HAR are rules adopted by the Hawai'i Contractors License Board to regulate general and specialty construction contractors. Exhibit A to Chapter 77, lists the different subclassifications of specialty contractors and defines the scope of work that can be performed by each specialty contractor subclassification. It defines the scope of work for classification C–37 as follows:

**Plumbing contractor.** To install, repair, or alter complete plumbing systems which shall include supply water piping systems, waste water piping systems, fuel gas piping systems, and other fluid piping systems; the equipment, instrumentation, non-electric controls, and the fixture for these systems and the venting for waste water piping systems and fuel gas piping systems; for any purpose in connection with the use and occupancy of buildings, structures, works, and premises where people or animals live, work, and assemble; including piping for vacuum, air, and medical gas systems, spas and swimming pools, lawn sprinkler systems, irrigation systems, sewer lines and related sewage disposal work performed within property lines, fire protection sprinkler systems when supervised by licensed mechanical engineers or licensed fire protection contractors, and solar hot water heating systems, and the trenching, backfilling, patching, and surface restoration in connection therewith[.]

Exhibit A at A–10. The C–37 specialty contractor classification includes a number of subclassifications. Specifically, C–37a is the subclassification for "sewer and drain line contractor"; C–37b is for "irrigation and lawn sprinkler systems contractor"; C–37c is for "vacuum and air systems contractor"; C–37d is for "water chlorination contractor"; C–37e is for "treatment and pumping facilities contractor"; and C–37f is for "fuel dispensing contractor"[.] HAR § 16–77, Exhibit A at A–2.

8. The HAR defines a C–41 classification as follows: "**Reinforcing steel contractor.** To fabricate, place and tie steel reinforcing bars (rods), of any profile, perimeter, or cross-section, that are or may be used to reinforce concrete buildings and structures[.]" HAR § 16–77, Exhibit A at A–12.

9. The C–42 classification is defined in HAR § 16–77, Exhibit A, as follows:

**Roofing contractor.** To install a watertight covering to roof surface by use of, but not limited to, cedar, cement, asbestos, metal, and composition shingles, wood shakes, cement and clay tile, built-up roofing, single ply, fluid type roofing systems, and other acceptable roofing materials including spray urethane foam, asphalt, and application of protective or reflective roof, or both, and deck coatings[.]

10. At oral argument, Okada's attorney, when asked about his own client's failure to list a "C–37" licensed plumbing subcontractor, stated that Okada did list a subcontractor with a "C–37d" water chlorination subclassification specialty. Okada's attorney further represented that the rules governing contractors provided that a subcontractor who held a license to perform work that was a subclassification of a "C–37" specialty license was automatically authorized to perform all aspects of a "C–37" license. Therefore, according to the attorney, Okada, by listing a "C–37d" subcontractor, had listed a subcontractor to perform "C–37" work.

Our review of the rules governing contractors that were promulgated by the Contractors License Board, which is administratively part of the Department of Commerce and Consumer Affairs, State of Hawai'i (DCCA), indicates, however, that the converse of what Okada's attorney

## C. *The Bid Protests*

Following the bid opening, an agent of The Pacific Resources Partnership (PRP), an unregistered partnership doing business in Hawai'i whose stated mission is "to secure a level playing field for all public works contracts," contacted BWS to inquire about the status of the bid award for the Project. The PRP agent also communicated to BWS PRP's concern regarding Inter Island's failure to list all the specialty subcontractors that PRP believed were necessary to perform the construction for the Project.[11] Okada was then, and is now, a member of PRP.

Thereafter, PRP, through its attorney, submitted a letter of formal protest to BWS, requesting that BWS reject as nonresponsive any bids for the Project that did not include all of the specialty "C" licenses required to complete the work described in the bid documents. In the letter, PRP explained, in relevant part:

> We submit that any bid proposal which does not include all of the specialty licenses (to be held by either the bidder and/or its joint contractor/subcontractor) required to complete the work described in the bid documents should be deemed non-responsive and, therefore, disqualified or rejected. For example, the bid proposal of [Inter Island] for [the Project] indicates that neither [Inter Island] nor any of its joint contractors or subcontractors holds the "C–37" (Plumbing), "C–41" (Reinforcing Steel) and "C–42" (Roofing) contractor's licenses, all of which are required for significant portions of the contract work.
>
> Pursuant to the Contractors Law, [HRS] Chapter 444, and its related administrative rules, any licensee who acts, assumes to

act, or advertises in any classification other than for which the licensee is duly licensed shall be construed to have engaged in unlicensed activity. Although a licensee who holds the "A" general engineering contractor classification is automatically allowed to work in certain other specialty classifications without further examination or licensing fees, the C–37, C–41 and C–42 classifications do not fall within this exemption. The technical nature of Plumbing, Reinforcing Steel and Roofing work mandates that only a licensee who holds these particular specialty licenses be permitted to complete this work. The safety of the public and the integrity of this special work requires the strict application of this licensing law....

> Moreover, any proposition that—

> (1) an "A" general engineering contractor can engage in any contract which provides for more than two unrelated building trades, even if the general engineering contractor does not possess the specialty licenses for such trades, or

> (2) the Plumbing, Reinforcing Steel and Roofing work required under the subject contract is merely incidental and supplemental to the work needed to complete the contract,

> is illogical, contrary to the consumer protection purpose of the Contractors Law, and will certainly be rejected by the Courts.

> Finally, note that any misapplication of the licensing requirements (such as by allowing an "A" general engineering contractor to complete Plumbing, Reinforcing Steel and/or Roofing work without the re-

---

represented is true. HAR § 16–77–32(d) states that "[l]icensees who hold a specialty contractors license shall automatically hold the subclassifications of the licensee's particular specialty without examination or paying additional fees." Therefore, a "C–37" plumbing contractor would automatically hold licenses in the "C–37a," "C–37b," "C–37c," "C–37d," "C–37e," and "C–37f" plumbing subclassifications. However, a "C–37d" license would not entitle the holder to practice in the broader "C–37" category. Therefore, Okada's listing of a "C–37d" subcontractor would not satisfy a requirement that it list a "C–37" subcontractor.

Moreover, the record indicates that Inter Island also listed a "C–37d" water chlorination subcontractor in its bid. If the statement of Okada's attorney were true, then Inter Island was in exactly the same situation as Okada.

**11.** Although the communication is not included in the record, the Pacific Resources Partnership presumably asserted then, as it did in its June 21, 1999 letter, that Inter Island did not list subcontractors possessing the C–37, C–41 and C–42 classifications.

lated specialty licenses), even if inadvertent, will result in the misclassification of specialty work. This practice will skew the "prevailing wages" standards established under [HRS] Chapter 104 for public works contracts, and otherwise cause major unrest in the Construction Industry.

After receiving PRP's protest, a BWS employee telephoned the president of Inter Island to inquire about Inter Island's failure to list in its bid any licensed plumbing, reinforcing steel, and roofing subcontractors, and to request confirmation that Inter Island had received proposals from appropriately licensed subcontractors in the three specialty areas. By a letter dated June 21, 1999 and time-stamped as received by BWS on July 1, 1999, Inter Island offered the following explanation for its failure to list the three specialty subcontractors:

> Quite simply, we did not list subcontractors for the plumbing and installation of the pumps as their quotes were considerably below 1% or $13,500. of our quotation. Under the "[HAR], TITLE 3" we are not required to list subcontractors under 1%. Please find enclosed quotations from our plumbing and pump supplier that were used for bidding purposes. The quotation for pump installation was quoted at $750./ day. We anticipated 2 days maximum for this portion of the work. As such, the price we used for the installation of the pumps was $1,500. Our plumbing quote was estimated to be $3,000. Both these prices were considerably below the 1% or $13,500.
>
> Should the [BWS] require us to use plumbers for the pipe fitting associated with the pumps which is normally performed under our "A" license, our subcontract to a plumbing contractor would still be less than 1%. [Inter Island] would supply the material and the assistance of our pipefit-

ters to a plumbing contractor such as J's Plumbing who we normally use for our plumbing requirements. Their quotation has been attached for your review.

Attached to Inter Island's letter were proposals from three specialty subcontractors: (1) a June 22, 1999 proposal from J's Plumbing, which had a "C–37" (plumbing) license, offering to "Install Building Pump Piping in accordance with plans & specifications" for $8,300; (2) a June 9, 1999 proposal from Associated Steel Workers, Ltd., which had a "C–41" (reinforcing steel) specialty license, offering to furnish the labor for the "[i]nstallation of reinforcing steel complete in place according to plans and specifications" for the amount of $8,675; and (3) a June 10, 1999 proposal from ALCAL Hawaii, which had a "C–42" (roofing) license, offering to provide the labor to complete "Section 4.6 Built–Up Roofing" of the plans and specifications for the amount of $12,560. The quotations by all three specialty subcontractors covered only the price to furnish the licensed labor, with Inter Island providing the necessary materials and supplies. Additionally, the proposal of J's Plumbing expressly noted that Inter Island was to furnish "pipefitters to assist our plumbers while on jobsite."

On July 28, 1999, BWS dismissed PRP's protest and awarded the contract for the Project to Inter Island. In a letter to PRP dated July 28, 1999, BWS gave the following reasons for the dismissal:

1. Pursuant to [HAR] Sections 3–126–1[12] and 3–126–3, PRP does not have standing to file a valid protest of this solicitation;

2. PRP's protest letter was not received within five working days of the bid opening date as required by HAR Section 3–126–3(a)[13]; and

---

12. HAR § 3–126–1 defines "protestor" as "any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or the award of a contract and who files a protest."

13. HAR § 3–126–3 states:
   *Filing of protest.* (a) Protests shall be made in writing to the chief procurement officer or the head of a purchasing agency, and *shall be filed*

*in duplicate within five working days after the protestor knows or should have known of the facts leading to the filing of a protest.* A protest is considered filed when received by the chief procurement officer or the head of a purchasing agency. Protests filed after the five-day period shall not be considered.
(Emphasis added.)

3. The value of [Inter Island's] plumbing, reinforcing steel and roofing subcontractors were each less than one percent of the total project bid amount. Therefore, pursuant to [HRS] Section 103D-302(b), BWS has determined it is in its best interest to forego the listing requirement as to these three subcontractors.

(Footnotes added.)

On August 4, 1999, the attorney for PRP sent BWS another letter, this time on behalf of Okada, protesting the award of the contract to Inter Island for essentially the same reasons that had been raised by PRP in its protest. By a letter dated August 30, 1999, BWS denied Okada's protest as well, explaining that: (1) the protest was not filed within five working days of the bid opening date, when Okada knew or should have known of the facts which led to the filing of the protest [14]; and (2) BWS had the discretionary authority to waive Inter Island's failure to list the names of each specialty subcontractor whose work would cost less than one percent of the total bid amount.

### D. *The Administrative Hearing*

By a letter hand-delivered to the DCCA Hearings Office on September 10, 1999, Okada requested an administrative hearing to review BWS's denial of its protest, as allowed by HRS § 103D-709 (1993 & Supp.2000).[15]

14. BWS explained:

> Okada's protest does not allege any grievances arising from the July 28, 1999 award of the contract. Instead, Okada's protest is based solely on allegations that [Inter Island] failed to identify properly licensed subcontractors in its bid proposal. Such information was available to Okada on June 10, 1999 when the bids were opened. [HAR] requires:
>
>> Protests shall be made in writing to the chief procurement officer or the head of a purchasing agency, and shall be filed in duplicate **within five working days** after the protestor **knows or should have known of the facts leading to the filing of the protest.**
>
> Thus, Okada's protest of any irregularity in their competitor's listing of subcontractors should have been filed within five working days of the bid opening—June 17, 1999.

(Emphasis in original, citations omitted.)

15. Prior to July 1, 1999, when bids for the construction and installation of the Kaluanui Booster Station, Phase II were opened, HRS § 103D-709 (1993 & Supp.1998), provided, in relevant part, as follows:

> **Administrative proceedings for review.** (a) The several hearings officers appointed by the director of the department of commerce and consumer affairs pursuant to section 26-9(f) shall have jurisdiction to review and determine de novo any request from any bidder, offeror, contractor or governmental body aggrieved by a determination of the chief procurement officer, head of a purchasing agency, or a designee of either officer under sections 103D-310, 103D-701, or 103D-702.
>
> (b) Hearings to review and determine any request made pursuant to subsection (a) shall commence within twenty-one calendar days of receipt of the request. The hearings officers shall have power to issue subpoenas, administer oaths, hear testimony, find facts, make conclusions of law, and issue a written decision which shall be final and conclusive unless a person or governmental body adversely affected by the decision commences an appeal in the supreme court under section 103D-710.
>
> (c) The party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence. All parties to the proceeding shall be afforded an opportunity to present oral or documentary evidence, conduct cross-examination as may be required, and argument on all issues involved. The rules of evidence shall be strictly adhered to.
>
> . . . .
>
> (f) Hearings officers shall decide whether the determinations of the chief procurement officer or the head of the purchasing agency, or their respective designees were in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation or contract.

Effective July 1, 1999, subsections (c) and (f) of HRS § 103D-709 were amended to read:

> (c) Only parties to the protest made and decided pursuant to sections 103D-701, 103D-709(a), 103D-310(b), and 103D-702(f) may initiate a proceeding under this section. The party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence. All parties to the proceeding shall be afforded an opportunity to present oral or documentary evidence, conduct cross-examination as may be required, and argument on all issues involved. The rules of evidence shall [be strictly adhered to.] apply.
>
> . . . .
>
> (f) [Hearings officers] The hearings officer shall decide whether the determinations of the chief procurement officer or the [head of the

Okada and BWS stipulated to permit Inter Island to intervene as a respondent, and in a pre-hearing brief, Okada stated that it was seeking administrative review on two primary issues:

1. Whether or not [Inter Island's] protest filed with [BWS] on August 4, 1999 was timely?

2. Whether or not Inter Island's bid proposal was non-responsive because it did not list any joint contractor or subcontractor that is duly licensed as a Plumber?

A hearing before a DCCA hearings officer was held on September 29, 1999. At the conclusion of the hearing, the hearings officer requested that the parties submit proposed findings of fact (FsOF) and conclusions of law (CsOL) by October 14, 1999. Prior to this deadline, Okada filed a motion to reopen the hearing to allow it to submit "newly discovered evidence" that the June 9, 1999 proposal to Inter Island from Associated Steel Workers, Ltd. (the "C–41" reinforcing steel subcontractor) and the June 10, 1999 proposal to Inter Island from ALCAL Hawaii (the "C–42" roofing subcontractor) were actually solicited by Inter Island after the June 10, 1999 bid opening date, but backdated by the two subcontractors at Inter Island's request. The hearings officer denied Okada's motion, and Okada has not appealed the denial. Accordingly, for purposes of judicial review, it is not disputed that although reinforcing steel and roofing subcontractors were not identified by Inter Island in its bid, Inter Island had received written proposals from such subcontractors by the bid opening date.

Subsequently, in its proposed FsOF and CsOL, Okada expanded its bases for seeking administrative review. Okada argued that: (1) Inter Island was not a responsible bidder since it did not have a plumbing subcontrac-

tor who was contractually bound to provide any plumbing work to Inter Island at or prior to the bid opening date and it was undisputed that a licensed plumbing subcontractor was required to perform some of the work for the Project; (2) Inter Island's bid was nonresponsive because it failed to list the licensed subcontractors who would be performing the plumbing, reinforcing steel, and roofing work for the Project; and (3) BWS's waiver of Inter Island's failure to list the required plumbing, reinforcing steel, and roofing subcontractors was unlawful because (a) there was no justification, such as an inadvertent or unintentional mistake, for Inter Island's failure to list the required subcontractors; (b) the plumbing subcontractor's proposal was obtained by Inter Island after the bid opening; and (c) the plumbing subcontractor's proposal was for labor only and not for labor and materials as a package bid, which would have resulted in a proposal that would have been for an amount that was more than one percent of the total bid amount.

On November 10, 1999, the hearings officer issued his Decision. As a preliminary matter, the hearings officer concluded that Okada's protest of the contract award for the Project to Inter Island was timely.[16] The hearings officer then addressed Okada's remaining contentions and concluded, in summary, as follows:

(1) It is undisputed that Inter Island failed to identify in its bid the subcontractors with specialty classification licenses in plumbing (C–37), reinforcing steel (C–41), and roofing (C–42) to be engaged for the Project; therefore, Inter Island's bid did not comply with the subcontractor listing requirements imposed by HRS § 103D–302(b) and HAR § 3–122–21(a)(8) and was nonresponsive;

purchasing agency, or their respective designees] chief procurement officer's designee were in accordance with the Constitution, statutes, [regulations,] rules, and the terms and conditions of the solicitation or contract[.], and shall order such relief as may be appropriate in accordance with this chapter.
1999 Haw. Sess. L. Act 162, § 7 at 536–37 (new language underscored; deleted language in brackets; quotation marks omitted). The

changes, which became effective on July 1, 1999 and were thus in place at the time Okada filed its bid protest, are reflected in HRS § 103D–709 (1993 & Supp.2000).

16. In seeking judicial review of the November 10, 1999 Findings of Fact, Conclusions of Law and Decision issued by a hearings officer with DCCA, Inter Island raised no argument regarding this timeliness determination.

(2) Inter Island's bid was also nonresponsive because at the time of bid submission and bid opening, Inter Island did not have a plumbing subcontractor "lined up" and "contractually-bound to perform" the plumbing work under the contract for the Project;

(3) Inter Island was not a "responsible bidder," as defined in HRS § 103D–104 (1993) and HAR § 3–120–2, since it did not have a plumbing subcontractor bound to perform on the contract at the time of bid submission and bid opening and therefore did not have "the capability in all respects to perform fully" the contract requirements;

(4) HRS § 103D–302(b) and HAR § 122–21(a)(8) authorized BWS to accept construction bids that did not comply with the subcontractor listing requirement if (a) acceptance was in the best interest of BWS, and (b) the value of the work to be performed by an unlisted subcontractor was equal to or less than one percent of the total bid amount (one percent threshold);

(5) It was not unlawful or improper for Inter Island to have "the subcontractors who were to do the plumbing and reinforcing steel work submit proposals for labor only," and the value of each proposal submitted by the plumbing, reinforcing steel, and roofing subcontractors amounted to less than one percent of Inter Island's total bid amount, thereby satisfying the one percent threshold for waiver of the subcontractor listing requirement;

(6) Okada "established by a preponderance of the evidence that [BWS's] determination waiving the non-responsive aspects of [Inter Island's] bid as being in the best interest of [BWS] and awarding the Project contract to [Inter Island] was contrary to the provisions of the Procurement Code and the rules."

17. HRS § 103D–710(a) (Supp.2000) provides, as it did at the time of the proceedings below, as follows:
    **Judicial review.** (a) Only parties to proceedings under section 103D–709 who are aggrieved by a final decision of a hearings officer under that section may apply for judicial review of that decision. The proceedings for review shall be instituted in the supreme court.

The hearings officer ordered that the contract between BWS and Inter Island be terminated and that Inter Island be "compensated for actual expenses, if any, that were reasonably incurred under the contract and reasonable profit based upon any performance on the contract up to the time of termination." At oral argument before this court, the parties represented that following the entry of the hearing officer's Decision, BWS terminated the contract award to Inter Island and awarded the contract for the Project to Okada, which had commenced work under the contract.

### E. The Application for Judicial Review

On November 18, 1999, pursuant to HRS § 103D–710(a) (Supp.1999),[17] Inter Island timely filed an application with the Hawai'i Supreme Court for judicial review of the hearings officer's Decision. The supreme court subsequently entered an order, dated April 6, 2000, assigning the case to this court for disposition.

Inter Island argues that the hearing officer erred in concluding that: (1) its bid was "nonresponsive"; (2) it was not a "responsible bidder"; and (3) BWS violated the Procurement Code, HRS chapter 103D, by waiving the subcontractor listing requirement imposed by HRS § 103D–302(b) and HAR § 3–122–21(a)(8).

### STANDARDS OF REVIEW

#### A. Review of Hearings Officer Decisions

■■■■ The Hawai'i Supreme Court has explained that the standard by which appellate courts review the decisions of a DCCA hearings officer in a procurement case is governed by HRS § 103D–710(e) (1993). *Arakaki v. State Dep't of Accounting and Gen. Servs.*, 87 Hawai'i 147, 149, 952 P.2d 1210, 1212 (1998). HRS § 103D–710(e) provides:

HRS § 103D–709 (1993 & Supp.2000) sets forth the procedural requirements for administrative de novo review of protests and questions related to bid situations by the "several hearings officers appointed by the director of the department of commerce and consumer affairs[.]"

Upon review of the record the court may affirm the decision of the hearings officer issued pursuant to [HRS] section 103D–709 or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if substantial rights may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority or jurisdiction of the chief procurement officer or head of the purchasing agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The supreme court elaborated in *Arakaki* that

conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and the [h]earings [o]fficer's exercise of discretion under subsection (6). Accordingly, a reviewing court will reverse a [h]earings [o]fficer's finding of fact if it concludes that such ·... finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. On the other hand, the [h]earings [o]fficer's conclusions of law are freely reviewable.

*Arakaki*, 87 Hawai'i at 149, 952 P.2d at 1212 (quoting *In re CARL Corp. v. State Dep't of Educ.*, 85 Hawai'i 431, 446–47, 946 P.2d 1, 16–17 (1997)). Additionally, the supreme court has stated that a conclusion of law

that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an

appellate court must give deference to the agency's expertise and experience in the particular field.

*Southern Foods Group, L.P. v. State Dep't of Educ.*, 89 Hawai'i 443, 452, 974 P.2d 1033, 1042 (1999) (citation and quotation marks omitted). When considering an agency's discretion, appellate courts must consider that

discretion denotes the absence of a hard and fast rule. When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.

*Id.* (brackets omitted). "A hearings officer abuses his or her discretion when he or she clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Id.* (quotation marks omitted). "Indeed, in order to reverse or modify an agency decision, the appellate court must conclude that an appellant's substantial rights were prejudiced by the agency." *Id.* at 453, 974 P.2d at 1043.

In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, *a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise* and one seeking to upset the order bears the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

*Id.* (emphasis in original).

### B. *Statutory Construction*

■ The supreme court has stated that "[t]he interpretation of a statute is a question of law reviewable *de novo.*" *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997). Moreover, in construing a statute, an appellate court's

foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.

And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) (1993). Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Id.* at 148, 931 P.2d at 590 (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets, ellipses, and footnote omitted). An appellate court may also consider

"[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Korean Buddhist Dae Won Sa Temple v. Sullivan*, 87 Hawai'i 217, 230, 953 P.2d 1315, 1328 (1998) (quoting *State v. Cullen*, 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997)) (brackets in original).

### DISCUSSION

A.  *The Requirement that Contracts be Awarded to the Lowest Responsible and Responsive Bidder*

1.

HRS § 103D–302(h) (Supp.2000) [18] provides, in pertinent part, that contracts awarded pursuant to the competitive sealed bidding process "shall be awarded with reasonable promptness by written notice to the lowest

*responsible* and *responsive* bidder whose bid meets the requirements and criteria set forth in the invitation for bids." (Emphases added.)

HRS § 103D–104 (Supp.2000) defines a "responsible bidder" as "a person who has the capability in all respects to perform fully the contract requirements, and the integrity and reliability which will assure good faith performance." Additionally, HRS § 103D–310 (Supp.2000), entitled "Responsibility of offerors," states, in relevant part:

(b) ... [T]he procurement officer shall determine whether the prospective offeror has the financial ability, resources, skills, capability, and business integrity necessary to perform the work. *For this purpose, the officer, in the officer's discretion, may require any prospective offeror to submit answers, under oath, to questions contained in a standard form of questionnaire to be prepared by the [procurement] policy board. Whenever it appears from answers to the questionnaire or otherwise, that the prospective offeror is not fully qualified and able to perform the intended work, a written determination of nonresponsibility of an offeror shall be made by the head of the purchasing agency, in accordance with rules adopted by the policy board. ...*

(Emphasis added.) Among the rules adopted by the procurement policy board is HAR § 3–122–110, which states, partly, as follows:

*Determination of nonresponsibility.* (a) The procurement officer shall determine, on the basis of available information, the responsibility or nonresponsibility of a prospective offeror.

(b) If the procurement officer requires additional information, the prospective offeror shall promptly supply the information. Failure to supply the requested information at least forty-eight hours prior to the time advertised for the opening shall be considered unreasonable and may be grounds for a determination of nonresponsibility.

---

18. The language of HRS § 103D–302 (Supp. 2000) is the same as it was when the administra- tive proceedings underlying this application for appellate judicial review occurred.

(c) Notwithstanding the provision of paragraph (b), the head of the purchasing agency shall not be precluded from requesting additional information.

The term "responsive bidder" is defined in HRS § 103D–104 as "a person who has submitted a bid which conforms in all material respects to the invitation for bids."

The Hawai'i Supreme Court has explained that

> [t]he requirement that a bid be responsive is designed to avoid unfairness to other contractors who submitted a sealed bid on the understanding that they must comply with all of the specifications and conditions in the invitation for bids, and who could have made a better proposal if they imposed conditions upon or variances from the contractual terms the government had specified. The rule also avoids placing the contracting officer in the difficult position of having to balance the more favorable offer of the deviating bidder against the disadvantages to the government from the qualifications and conditions the bidder has added. In short, the requirement of responsiveness is designed to avoid a method of awarding government contracts that would be similar to negotiating agreements but which would lack the safeguards present in either that system or in true competitive bidding.

*Southern Foods Group*, 89 Hawai'i at 456, 974 P.2d at 1046 (quoting *Toyo Menka Kaisha, Ltd.*, 597 F.2d 1371, 1377, 220 Ct.Cl. 210 (1979)).

■ A bid need not strictly comply with the requirements of an IFB to be accepted. The definition of "responsive bidder" contained in HRS § 103D–104, to the extent that it refers to a responsive bid as one "which conforms in all material respects to the [IFB]," does provide some flexibility to overlook minor deviations from the IFB. In discussing what constitutes a "material deviation" from an IFB, the supreme court held in *Southern Foods Group* that

> deviations from advertised specifications may be waived by the contracting officer provided they do not go to the substance of the bid or work an injustice to other bidders. *A substantial deviation is defined*

*as one which affects either the price, quantity, or quality of the article offered.*

*Id.* at 456, 974 P.2d at 1046 (1999) (quoting *Toyo Menka Kaisha, Ltd.*, 597 F.2d at 1376) (brackets omitted; emphasis in original).

2.

Case law also recognizes a material difference between a "responsible bidder" and a "responsive bidder." In *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519 (1991), the award of a dredging contract to the lowest bidder was challenged as being nonresponsive because the bid failed to include a schedule listing the plant and equipment to be used for the contract project. The claims court explained:

> Responsiveness addresses whether a bidder has promised to perform in the precise manner requested by the government. To be considered for an award a bid must comply in all material respects with the invitation for bids. A responsive bid is one that, if accepted by the government as submitted, will obligate the contractor to perform the exact thing called for in the solicitation. If there is material nonconformity in a bid, it must be rejected. Material nonconformity goes to the substance of the bid which affects the price, quality, quantity, or delivery of the article or service offered.
>
> Responsibility addresses the issue of the performance capability of a bidder, which can include inquiries into financial resources, experience, management, past performance, place of performance, and integrity. In contrast to responsiveness, a bidder may present evidence of responsibility after bid opening up until the time of award.
>
> In terms of identifying whether a particular requirement is related to responsiveness or responsibility, the distinction is whether the bidder will conform to the IFB, as opposed to how the bidder will accomplish conformance. Stated another way, the concept of responsibility specifically concerns the question of a bidder's performance capability, as opposed to its

promise to perform the contract, which is a matter of responsiveness.

*Id.* at 522–23 (citations and quotation marks omitted).

In *Blount, Inc. v. United States,* 22 Cl.Ct. 221 (1990), the claims court was asked to enjoin the Bureau of Prison's rejection, on nonresponsiveness grounds, of the lowest bid for a prison construction contract, submitted by Blount, Inc. (Blount). Blount had indicated, on a business management questionnaire submitted with its bid, that its firm would be self-performing "approximately 10%" or "approximately $6,000,000" of the work under the contract, for which Blount had bid a price of $63,287,000. *Id.* at 224. The IFB for the contract, however, included the following "Performance of Work" clause:

> The contractor shall perform on the site, and with its own organization, work equivalent to at least *20 percent* of the total amount of work to be performed under the contract. This percentage may be reduced by a supplemental agreement to this contract if, during performing the work, the Contractor requests a reduction and the Contracting Officer determines that the reduction would be to the advantage of the Government.

*Id.* at 223 (emphasis in original). The claims court initially stated:

> The court must determine at the outset whether the "Performance of Work" clause contained in the IFB and the Business Management Questionnaire submitted with Blount's bid relate to bidder responsiveness or responsibility. Responsiveness refers to the question of whether a bidder has promised to perform in the precise manner requested by the government. Responsibility, by contrast, involves an inquiry into the bidder's ability and will to perform the subject contract as promised. Matters of bid responsiveness must be discerned solely by reference to the materials submitted with the bid and facts available to the government at the time of bid opening. However, responsibility determinations are made at the time of award. A bidder may present evidence subsequent to bid opening but prior to award to demonstrate the bidder's responsibility.

> . . . .

> . . . . [A] bid which contains a material nonconformity must be rejected as nonresponsive. Material terms and conditions of a solicitation involve price, quality, quantity, and delivery. The rule is designed to prevent bidders from taking exception to material provisions of the contract in order to gain an unfair advantage over competitors and to assure that the government evaluates all bids on an equal basis. In other words, a bidder cannot receive award by offering a less expensive method of performance than that required by the solicitation.

> Responsibility concerns how a bidder will accomplish conformance with the material provisions of the contract. Responsibility addresses the performance capability of a bidder, and normally involves an inquiry into the potential contractor's financial resources, experience, management, past performance, place of performance, and integrity.

*Id.* at 226–27 (citations omitted). The claims court refused to issue the injunction order requested by Blount, explaining as follows:

> The "Performance of Work" clause was . . . designed to ensure that critical construction contracts are awarded to firms which possess the requisite experience, management, and supervisory capabilities to complete the contract in a timely and satisfactory manner. The clause represents the foregone conclusion that a contractor with the ability to perform a certain percentage of the contract with its own resources is likely to possess such qualities. In so doing, the "Performance of Work" clause examines the method by which a bidder will meet the obligations of the contract rather than the bidder's promise to perform the contract . . . . The court finds that the "Performance of Work" clause and question 3 of the Business Management Questionnaire examine the performance capability of bidders and were primarily included in the solicitation to ensure that the successful bidder on the prison facilities project was a responsible contractor.

Although the 20 percent self-performance requirement was designed to test bidder responsibility, the court's analysis cannot end here. The court has previously stated that information intended to reflect on bidder responsibility can render a bid nonresponsive if the information indicates that the bidder does not intend to comply with the material requirements of the IFB. The "Performance of Work" clause was clearly a term or condition of the IFB. In requiring the contractor to self-perform 20 percent of the work under the contract, the clause directly impacted bid price. The self-performance requirement limited the amount of work which could be subcontracted under the contract. A contractor can generally achieve considerable savings by subcontracting work to firms with lower cost structures who are capable of performing the project with less expense. As such, a contractor may gain a sizeable bid pricing advantage by subcontracting more work than its competitors. Since compliance with the "Performance of Work" clause invariably affected bid price, the "Performance of Work" clause constitutes a material term of the IFB. Although the clause was designed to help ensure that award was made to a qualified bidder, the 20 percent self-performance requirement was nevertheless part of the IFB and, therefore, the contractor was expected to comply with this requirement like any other material provision of the contract.

. . . . By promising to self-perform only 10 percent of the contract work in the face of the 20 percent requirement imposed by the "Performance of Work" clause, Blount took affirmative exception to a material provision of the IFB. Blount's response to question 3 of the business questionnaire therefore constituted a material deviation from the IFB which rendered its bid nonresponsive at bid opening. Blount could not, thereafter, correct its response to the questionnaire or attempt to explain why its bid was in fact responsive to the IFB.

*Id.* at 227–29 (citations and footnotes omitted).

3.

In this case, the hearings officer determined that Inter Island's bid was nonresponsive because it did not list a properly licensed plumbing, reinforcing steel, and roofing subcontractor. The hearings officer also determined that Inter Island was not a responsible bidder because it did not have a contractually bound plumbing subcontractor available to perform the contract for the Project on bid opening date and therefore was incapable of performing the contract.

The correctness of the foregoing determinations depends, therefore, on whether Inter Island was required by the IFB and applicable statutes or rules to use and list subcontractors in the three specialty classifications to perform work under the contract.

B. *The Subcontractor Listing Requirement*

In 1993, the Hawai'i State Legislature met in special session to enact a comprehensive new Procurement Code, which was subsequently codified as HRS chapter 103D. 1993 Haw. Sp. Sess. L. Act 8, § 1 at 37–38. One of the statutory provisions included in the new Procurement Code was HRS § 103D–302(b), which originally read:

An invitation for bids shall be issued, and shall include a purchase description and all contractual terms and conditions applicable to the procurement. If the invitation for bids is for construction, it *shall specify that all bids include the name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the contract* and the nature and scope of the work to be performed by each. Construction bids which do not comply with [this] requirement *may be accepted if the chief procurement officer or rules of the policy office conclude that acceptance is in the best interest of the public.*

HRS § 103D–302(b) (1993) (emphases added). HRS § 103D–302(b) was subsequently amended by Act 186, 1994 Haw. Sess. L. Act 186, § 9 at 422, to, among other changes, limit the discretion of the chief procurement officer to waive a bidder's failure to comply with the subcontractor listing requirement:

An invitation for bids shall be issued[,] and shall include a purchase description and all contractual terms and conditions applicable to the procurement. If the invitation for bids is for construction, it shall specify that all bids include the name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the contract and the nature and scope of the work to be performed by each. Construction bids [which] that do not comply with this requirement may be accepted if the chief procurement officer or rules of the policy office conclude that acceptance is in the best interest of the public[.] and the value of the work to be performed by the joint contractor or subcontractor is equal to or less than one per cent of the total bid amount.

1994 Haw. Sess. L. Act 186, § 9 at 422 (deleted statutory material bracketed; new statutory material underscored). According to the legislative history of Act 186, the amendment

[e]xempt[s] a construction bid from the requirement that all joint contractors and subcontractors be named and their work described in the bid, if the value of the work to be performed by each of the joint contractors or subcontractors is equal to or less than one per cent of the total bid amount, in addition to being deemed by the [procurement] policy office to be in the best interest of the public[.]

Sen. Stand. Comm. Rep. No. 2959, in 1994 Senate Journal, at 1177 (emphasis added). Thus the intent of the legislature was to add a one percent or less threshold to qualify for a waiver of a violation of the subcontractor listing requirement.[19]

The Procurement Code was based in large part on the American Bar Association's Model Procurement Code for State and Local Government (the Model Code). Sen. Stand.

Comm. Rep. No. S8–93, in 1993 Senate Journal (Sp.), at 39. Although the Model Code did not include a subcontractor listing requirement similar to HRS § 103D–302(b), such a requirement already existed under the Hawai'i procurement laws in effect prior to the adoption of the Procurement Code.

Specifically, HRS § 103–29 (1985), which was repealed when the Procurement Code went into effect, stated:

**Bids to include certain information.** In addition to meeting other requirements of bidders for public works construction contracts each such bid *shall include the name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the public works construction contract.* The bid shall also indicate the nature and scope of the work to be performed by such joint contractor or subcontractors. *All bids which do not comply with this requirement shall be rejected.*

(Emphases added.) HRS § 103–29 was enacted simultaneously with the now-repealed HRS § 103–33 as part of 1963 Haw. Sess. L. Act 185 at 228. HRS § 103–33 (1985) provided as follows:

**Termination of contract by contracting agency.** The contracting officer for any contract executed in accordance with this chapter may terminate the contract at any time when, in the opinion of the contracting officer, the contractor has made unjustifiable and substantive changes from the condition set forth in the contractor's original itemized bid; provided that the changes which are directly due to the failure, refusal, or inability of a subcontractor named in the contractor's original itemized bid in accordance with section 103–29 to enter into the subcontract or because of the subcontractor's insolvency, inability to furnish a reasonable performance bond,

---

19. In construing an exemption from a subcontractor listing statute, the Delaware Supreme Court explained the purpose of such a provision as follows:

[I]n situations where certain specialty work is *de minimis* as compared to the overall project a means should be established whereby it can be removed from the realm constituting a bid condition ... so as to avoid a situation ...

where the State, and thus the taxpayer, are deprived of the benefit of an otherwise advantageous low bid because of a technical defect or oversight in a bid proposal as to specialty work which forms only a fractional part of the entire contract.

*George & Lynch, Inc. v. Division of Parks and Recreation,* 465 A.2d 345, 349 (Del.1983).

suspension or revocation of the subcontractor's license, or failure or inability to comply with other requirements of the law applicable to contractors, subcontractors, and public works projects shall not be deemed to be unjustifiable and substantive changes warranting termination of the contract by the contracting officer. Upon termination, the contracting officer shall limit payment to the contractor to that part of the contract satisfactorily completed at the time of termination.

The purpose clause of Act 185 stated:

The purpose of this Act is to require bidders on public works contracts to include in their bids the names of all other persons or firms to be engaged on the project as joint contractors or subcontractors and to indicate the nature of the work such joint contractor or subcontractor will perform; and to provide for the termination of the contract by the contracting agency in cases where the contractor makes substantive changes from his [or her] original itemized bid.

1963 Haw. Sess. L. Act 185, § 1 at 228. When the subcontractor listing and the termination provisions enacted by Act 185 are construed together, therefore, it is evident that the listing requirement was intended to protect subcontractors named by a contractor in its bid from being substituted after bid award, except where the named subcontractors were unable, for specific reasons set forth in HRS § 103–33, to perform their subcontract with the contractor. In the event unauthorized substitution of a subcontractor was made by a contractor, the contracting agency was required to terminate the contract.

Under the Procurement Code in existence now, a termination requirement similar to the former HRS § 103–33 is provided in HRS § 103D–302(g) (Supp.2000), which states, in relevant part:

After bid opening no changes in bid prices or other provisions of bids prejudicial to the interest of the public or to fair competition shall be permitted. Except as otherwise provided by rule, all decisions to permit the correction or withdrawal of bids, to cancel awards or contracts based

on bid mistakes, shall be supported by a written determination made by the chief procurement officer or head of a purchasing agency.

1.

The hearings officer determined, in Finding of Fact No. 7 of his Decision, that "[a]t least a portion of the work described under Item No. 2 [of the IFB Proposal form] required the services of a duly licensed plumber with a C–37 specialty classification license for completion." In another section of the Decision, the hearings officer stated that there was no "dispute concerning the need for the performance of work by subcontractors with specialty classification licenses in plumbing (C–37), reinforcing steel (C–41) and roofing (C–42) for the completion of the Project nor that [Inter Island] did not hold the necessary specialty classification licenses to do that."

In concluding that Inter Island's bid was nonresponsive and that Inter Island was not a responsible bidder, the hearings officer relied in part on a decision by another DCCA hearings officer in the case of *In re Hawaiian Dredging*, PCH–99–6 (HOFO August 9, 1999). In that case, the issue presented was whether after bid opening, the contractor submitting the lowest bid could substitute a subcontractor listed in the bid, who was determined not to have the necessary experience required by the IFB, with a subcontractor who had the requisite experience. In answering the question in the negative, the hearings officer in the *Hawaiian Dredging* case commented that the subcontractor listing requirement was primarily instituted to prevent bid shopping and bid peddling.

The hearings officer in *Hawaiian Dredging* noted that

[b]id shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids. Bid peddling, conversely, is an attempt by a subcontractor to undercut known bids already submitted to the general contractor in order

to procure the job. [20]

*Id.* at 11 (footnote added). The hearings officer then quoted with approval a portion of the *Hawaiian Dredging* decision and expanded the principles expressed therein to the facts in this case:

Thus, the listing requirement of HRS § 103D–302(b) was, in part, based upon the recognition that a low bidder who is allowed to replace a subcontractor after bid opening would generally have a greater leverage in its bargaining with other, potential subcontractors. By forcing the contractor to commit, when it submits its bid, to utilize a specified subcontractor, the Code seeks to guard against bid shopping and bid peddling. Thus, with one narrow exception, the failure to list a subcontractor in a bid for construction work renders a bid non-responsive under HRS § 103D–302(b). It therefore stands to reason that HRS § 103D–302(b) also precludes the substitution of a listed subcontractor after bid opening, at least in cases where the antibid shopping purpose of the listing re-

quirement may be undermined. Any other conclusions would nullify the underlying intent of the listing requirement.

*In the Matter of Hawaiian Dredging Construction Company,* supra at 4. Citations and footnotes omitted.

The principle expressed in that matter is equally applicable here although the specific facts may not be the same. The situation presented in this matter in fact presents a more egregious situation for [Inter Island] had not only failed to provide the name of a plumbing subcontractor needed to perform construction on the Project, but, did not have a contractually bound plumbing subcontractor whose name it could provide at the time it submitted its bid or at the time of bid opening. The fact that [Inter Island] had obtained and identified J's Plumbing as its plumbing subcontractor after bid opening did not rectify the non-responsive aspect of its bid relating to [Inter Island's] failure to have a contractually bound subcontractor at the time [Inter Island] submitted its bid. To

---

20. Bid shopping has been similarly defined elsewhere. A comment within the UCLA Law Review explained that "[b]id shopping is the use by the general [contractor] of one subcontractor's low bid as a tool in negotiating lower bids from other subcontractors. Bid peddling, conversely, is the practice whereby subcontractors attempt to undercut known bid prices of other subcontractors in order to get a job." Comment, *Bid Shopping and Peddling in the Subcontract Construction Industry,* 18 UCLA L.Rev. 389, 394 (1970) (authored by Thomas P. Lambert). The Comment further explained the dangers of bid shopping and peddling:

First, as bid shopping becomes common within a particular trade, the subcontractors will pad their initial bids in order to make further reductions during post-award negotiations. This artificial inflation of subcontractor's offers makes the bidding process less effective. Second, subcontractors who are forced into post-award negotiations with the general often must reduce their sub-bids in order to avoid losing the award. Thus, they will be faced with a Hobson's choice between doing the job at a loss or doing a less than adequate job. Third, bid shopping and peddling tend to increase the risk of loss of the time and money used in preparing a bid. This occurs because generals and subcontractors who engage in these practices use, without expense, the bid estimates prepared by others. Fourth, it is often impossible for a general to obtain bids far enough in advance to have sufficient time to properly

prepare his [or her] own bid because of the practice, common among many subcontractors, of holding sub-bids until the last possible moment in order to avoid pre-award bid shopping by the general. Fifth, many subcontractors refuse to submit bids for jobs on which they expect bid shopping. As a result, competition is reduced, and, consequently, construction prices are increased. Sixth, any price reductions gained through the use of post-award bid shopping by the general will be of no benefit to the awarding authority, to whom these price reductions would normally accrue as a result of open competition before the award of the prime contract. Free competition in an open market is therefore perverted because of the use of post-award bid shopping.

. . . .

In the case of *post-award* shopping, . . . the detrimental effects are more pervasive. Here the negotiations take place in a market completely controlled by the general who has been awarded the prime contract; post-award bid shopping is therefore much less like free competition. Moreover, any reduction in the sub-bid will be to the detriment of both the subcontractor and the awarding authority. The price on the overall contract having already been set, the general's purpose here is simply to drive down his [or her] own cost, increasing his [or her] profit at the expense of the subcontractor.

*Id.* at 395–97 (emphasis in original; footnotes omitted).

allow such a procedure would be to allow bid shopping. Accordingly, the [h]earings [o]fficer concludes that [Inter Island's] failure to have a plumbing subcontractor bound and ready to perform on the contract at the time of bid submission, let alone at the time of bid opening, resulted in a non-responsive bid which should have been rejected. The attempt to allow [Inter Island] to rectify its failure by obtaining a plumbing subcontractor *after* bid opening, violated the provisions of the Procurement Code which were designed to treat all bidders fairly and equitably in their dealings with the government procurement system and to increase public confidence in the integrity of the government procurement system.

(Emphasis in original; block quotation format and footnote omitted.)

### 2.

■ We agree with the hearings officer that the subcontractor listing requirement of HRS § 103D–302(b) is intended to guard against bid shopping by a contractor or bid peddling by subcontractors who were not listed in the contractor's bid.

However, we conclude that the hearings officer was wrong in holding that Inter Island was required to list in its bid subcontractors with a "C–37" plumbing, "C–41" reinforcing steel, and "C–42" roofing specialty license.

■ Construed literally, HRS § 103D–302(b) does not mandate that a public works construction contractor use specialty subcontractors in performing portions of the construction work. The only requirement is that a contractor list those subcontractors who are "*to be engaged* by the bidder as a joint contractor or subcontractor in the performance of the contract and the nature and scope of the work to be performed by each." HRS § 103D–302(b) (emphasis added). Similarly, HAR § 3–122–21(a)(8), which was ex-

pressly made a part of the IFB by the "*REVISED GENERAL PROVISIONS OF CONSTRUCTION CONTRACTS*" section of the IFB, provides:

For construction projects the bidder shall provide:

(A) The name of each person or firm *to be engaged* by the bidder as a joint contractor or subcontractor in the performance of the contract; and

(B) The nature and scope of the work to be performed by each.

(Emphasis added.) Therefore, if a contractor does not plan to use a subcontractor in the performance of the contract, and the contractor is not required by statute, rule, or the IFB to use a joint contractor or subcontractor to perform portions of the contract,[21] the contractor is not required to list any joint subcontractor.

■ Of course, once a bidder names a subcontractor, that subcontractor cannot be substituted, unless substitution is permitted pursuant to HRS § 103D–302(g). Conversely, if a bidder does not name a subcontractor for specialty work and the bidder subsequently wishes to use a subcontractor to perform such work, the bidder will similarly not be allowed to do so unless authorized to do so pursuant to HRS § 103D–302(g).

### 3.

■ The conclusions of the hearings officer that: (1) Inter Island was not a responsible bidder because it had not "lined up" a plumbing subcontractor to do the plumbing work required under the contract; and (2) Inter Island's bid was nonresponsive because it did not list the required plumbing, reinforcing steel, and roofing joint contractors or subcontractors necessary for completion of the Project, were premised in large part on the hearings officer's determination that Inter Island was required to use the

---

**21.** In this case, for example, the IFB issued by BWS specifically required that "[r]estoration of pavements shall be done by a contractor holding a current *C–3—ASPHALT PAVING AND SURFACING CONTRACTOR* specialty license for the State of Hawaii [Hawai'i.]" (Emphasis in original.) Additionally, the IFB required that "[a]ll construction contract bids involving any chlorination work shall have a name listed for the C–37d Water Chlorination Subcontractor." Consequently, all bidders were required to list a joint contractor or subcontractor with the appropriate C–3 and C–37d specialty contractor licenses in order to be responsive to the IFB.

three types of specialty contractors on the job.

Based on our review of HRS chapter 444, the statute governing contractors, and HAR Title 16, chapter 77, the rules promulgated by the Contractors License Board to implement HRS chapter 444, we conclude that the hearings officer's determination was wrong.

It is undisputed in this case that Inter Island held both an "A" general engineering contracting license and a "B" general building contracting license. Under the classification scheme set forth in HRS chapter 444 and HAR Title 16, chapter 77, holders of an "A" and "B" license have quite broad contracting authority. HRS § 444–7(b) and (c) (1993) states:

(b) A general engineering contractor is a contractor whose principal contracting business is in connection with fixed works requiring specialized engineering knowledge and skill, including the following divisions or subjects: irrigation, drainage, water power, water supply, flood control, inland waterways, harbors, docks and wharves, shipyards and ports, dams and hydroelectric projects, levees, river control and reclamation works, railroads, highways, streets and roads, tunnels, airports and airways, sewers and sewage disposal plants and systems, waste reduction plants, bridges, overpasses, underpasses and other similar works, pipelines and other systems for the transmission of petroleum and other liquid or gaseous substances, parks, playgrounds and other recreational works, refineries, chemical plants and similar industrial plants requiring specialized engineering knowledge and skill, powerhouses, power plants and other utility plants and installations, mines and metallurgical plants, land levelling and earth-moving projects, excavating, grading, trenching, paving and surfacing work and cement and concrete works in connection with the above mentioned fixed works.

(c) A general building contractor is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof.

Pursuant to HAR § 16–77–32, contractors who hold "A" or "B" licenses automatically hold licenses in certain specialty classifications.[22] HAR § 16–77–33 also contains the following limitation on the authority of "A" and "B" licensees:

(a) A licensee classified as an "A" general engineering contractor or as a "B" general building contractor shall not act, assume to act, or advertise as a specialty contractor except in the specialty classifications which the licensee holds.

(b) A general building contractor license does not entitle the holder to undertake a contract unless it requires more than two unrelated building trades or crafts or unless the general building contractor holds the specialty license to undertake the contract. Work performed which is incidental and supplemental[23] to one contractor classification shall not be considered as unrelated trades or crafts.

(Footnote added.) Furthermore, HAR § 16–77–32 provides that an "A" general engineering contractor "may install duct lines, provided that installation of conductors is performed by a contractor holding the C–13 classification." Thus, an "A" contractor is required to engage the services of a C–13 subcontractor to perform specialty conductor-installation work.

The foregoing statutory provisions and rules regarding the scope of an "A" and "B" license indicate that an "A" contractor is authorized to generally undertake all contracts to construct fixed works requiring specialized engineering knowledge and skill in a wide range of subject areas, including water

22. See footnote 4 for text of rule.

23. HAR § 16–77–34 defines "[i]ncidental and supplemental" as "work in other trades directly

related to and necessary for the completion of the project undertaken by a licensee pursuant to the scope of the licensee's license."

power, water supply, and pipelines. A "B" contractor is authorized to undertake contracts to construct structures requiring "the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof." An "A" and "B" contractor is prohibited, however, from undertaking work solely in a specialty contracting area, unless the contractor holds a specialty license in that area.

The Project in this case included work involving specialized engineering skill and knowledge in water power, water supply, pipelines, and other utility plants and installations, and the IFB specifically required that all bidders possess an "A" license. Additionally, work for the Project clearly involved more than two unrelated building trades or crafts.[24] Therefore, Inter Island, pursuant to its "A" and "B" licenses, was authorized to undertake the Project with its own staff[25]; provided, of course, that where certain work required performance by individuals with particular licenses, Inter Island utilized employees who were appropriately licensed to perform such work.

## C. The Waiver Provision

In its prehearing statement to the hearings officer, BWS justified its award of the

24. The IFB Special Provisions specifically required the services of a C–3 (asphalt paving and surfacing) and C–37d (water chlorination) subcontractor. Additionally, the bid specifications required work in a number of other trades, e.g., plumbing, electrical, and landscaping.

25. We note that HRS § 444–2(7) (Supp.2000) provides an exemption from the contractor licensing requirements for

[o]wners or lessees of property who build or improve residential, farm, industrial, or commercial buildings or structures on property for their own use, or for use by their grandparents, parents, siblings, or children and who do not offer the buildings or structures for sale or lease; provided that this exemption shall not apply to electrical or plumbing work that must be performed only by persons or entities licensed under this chapter, or to the owner or lessee of the property if the owner or lessee is licensed under chapter 448E.

Additionally, HRS § 444–9.1(c) (Supp.2000) provides that to qualify for the exemption under HRS § 444–2(7), the owner of a building or structure who applies for a building permit must sign a disclosure statement that states in part:

contract to Inter Island by noting that "[t]he best interests of BWS would be protected if competition for public contracts was encouraged and the contracts were awarded to the lowest responsible bid. Therefore, BWS is obligated to determine if the apparent low bid is eligible for the exception provided by statute." BWS stated that upon consideration of Inter Island's bid, it concluded that "[s]ince the value of the work performed by each of the three subcontractors were each less than one percent of the total contract, and it is in the best interest of BWS to encourage competition, BWS exercised its discretion to accept [Inter Island's] bid."

The hearings officer disagreed with BWS. He explained that the issue presented was

whether the waiver of [Inter Island's] nonresponsive bid which not only failed to provide the name of its subcontractors as required by the statutes, rules and IFB, but, also, failed to have, at the time of the bid submission and bid opening, a contractually bound subcontractor to perform the required plumbing work on the Project was in the best interest of [BWS].

Contrary to the findings of BWS, the hearings officer concluded that the contract award was not in the best interest of BWS.[26]

It is your responsibility to make sure that subcontractors hired by you have licenses required by state law and by county licensing ordinances. Electrical or plumbing work must be performed by contractors licensed under chapters 448E and 444, [HRS]. Any person working on your building who is not licensed must be your employee which means that you must deduct F.I.C.A. and withholding taxes and provide workers' compensation for that employee, all as prescribed by law.

26. HRS § 103D–709(a) (1993) provides:

The several hearings officers appointed by the director of the department of commerce and consumer affairs pursuant to section 26–9(f) *shall have jurisdiction to review and determine de novo* any request from any bidder, offeror, contractor or governmental body aggrieved by a determination of the chief procurement officer, head of a purchasing agency, or a designee of either officer under sections 103D–310, 103D–701, or 103D–702.

(Emphasis added.) HRS § 103D–709(f) (Supp. 2000) provides that "[t]he hearings officer shall decide whether the determinations of the chief procurement officer or the chief procurement officer's designee were in accordance with the

After discussing the legislative intent behind the enactment of the Procurement Code, the hearings officer concluded that "acceptance of [Inter Island's] bid and award of the Project contract to [Inter Island] was not in the best interest of [BWS] as it was contrary to the expressed purposes and principles of the Procurement Code and the implementing rules." Specifically, the hearings officer explained that

> [a]lthough acceptance of [Inter Island's] low bid would maximize the purchasing value of public funds, such award to [Inter Island], conversely: (1) fails to ensure the fair and equitable treatment of all persons dealing with procurement systems, (2) fails to promote the maintenance of a procurement system of quality and integrity, and (3) fails to increase the public confidence in the public procurement procedures being followed.

Inter Island contends that the hearings officer "incorrectly found that it was unlawful under the Procurement Code for BWS to determine that it was in its best interest to waive the subcontractor listing requirement and allow Inter Island to obtain a written commitment from a plumbing subcontractor after bid opening." Because we have concluded that the hearings officer incorrectly determined that Inter Island was required to list a plumbing subcontractor in its bid, we need not address this contention.

### D. *The Appropriate Remedy*

In applying for judicial review, Inter Island requested that this court: (1) vacate or reverse the hearings officer's November 10, 1999 Decision and reinstate the award by BWS to Inter Island of the contract for the Project; and (2) terminate the subsequent award by BWS to Okada of the contract for the Project.

Although we conclude that the hearings officer erroneously determined that Inter Is-

land was required to use licensed "C–37," "C–41," and "C–42" specialty contractors to perform portions of the work for the Project, and also that the hearings officer erred in concluding that Inter Island was required to list such subcontractors in its bid, we decline to award Inter Island the relief it requests.

The supreme court has explained in *In re CARL Corp.* that our authority to order remedial relief in procurement protest cases is limited:

> Unlike the American Bar Association's Model Procurement Code for State and Local Governments (ABA Model Code), after which it was modeled, *see* Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal at 39, or, apparently, any other jurisdiction's procurement code, the State Procurement Code provides that
>
> > [t]he procedures and remedies provided for in this part, and the rules adopted by the policy office, shall be the exclusive means available for persons aggrieved in connection with the solicitation or award of a contract, ... to resolve their claims or differences. The contested case proceedings set out in chapter 91 [27] shall not apply to protested solicitations and awards[.]
>
> HRS § 103D–704 [ (1993) ].

The "remedies" available to a person aggrieved in connection with the solicitation or award of a contract are described in HRS §§ 103D–705 to 103D–707. HRS § 103D–705 provides that "[t]he provisions of section 103D–706 and section 103D–707 apply where it is determined administratively under sections 103D–701, ... and 103D–709, or upon judicial review or action under section[ ] 103D–710 ..., that a solicitation or award of a contract is in violation of the law." Sections 103D–706 and 103D–707 provide:

> [§ 103D–706] **Remedies prior to an award.** If prior to award it is determined that a solicitation or proposed

---

Constitution, statutes, rules, and the terms and conditions of the solicitation or contract and shall order such relief as may be appropriate in accordance with this chapter." Given the limitations of HRS § 103D–709(f) on a hearings officer's decision-making authority, we are not certain whether a hearings officer, following a *de*

*novo* evidentiary hearing, is allowed to second-guess a purchasing agency's discretionary decision and substitute his or her own judgment for that of the purchasing agency's.

**27.** HRS chapter 91 is commonly referred to as the "Hawaii Administrative Procedure Act."

award of a [contract] is in violation of law, then the solicitation or proposed award shall be:

(1) Cancelled; or

28. HAR § 3–126–38 similarly provides for "remedies after an award." It provides, in pertinent part:

(a) When there is no fraud or bad faith by a contractor:

(1) Upon finding after award that a state or county employee has made an unauthorized award of a contract or that a solicitation or contract award is otherwise in violation of law where there is no finding of fraud or bad faith, the chief procurement officer or the head of a purchasing agency may ratify or affirm the contract or terminate it in accordance with this section after consultation with the respective attorney general or corporation counsel, as applicable.

(2) If the violation can be waived without prejudice to the State or other bidders or offerors, the preferred action is to ratify and affirm the contract.

(3) If the violation cannot be waived without prejudice to the State or other bidders or offerors, if performance has not begun, and if there is time for resoliciting bids or offers, the contract shall be terminated. If there is no time for resoliciting bids or offers, the contract may be amended appropriately, ratified, and affirmed.

(4) If the violation cannot be waived without prejudice to the State or other bidders or offerors and if performance has begun, the chief procurement officer or the head of the purchasing agency shall determine in writing whether it is in the best interest of the State to terminate or to amend, ratify, and affirm the contract. Termination is the preferred remedy.

The following factors are among those pertinent in determining the State's best interest:

(A) The cost to the State in terminating and resoliciting;

(B) The possibility of returning goods delivered under the contract and thus decreasing the costs of termination;

(C) The progress made toward performing the whole contract; and

(D) The possibility of obtaining a more advantageous contract by resoliciting.

(5) Contracts based on awards or solicitations that were in violation of law shall be terminated at no cost to the State, if possible, unless the determination required under paragraphs (2) through (4) is made. If the contract is terminated, the State shall, where possible and by agreement with the supplier, return the goods delivered for a refund at no cost to the State or at a minimum restocking charge. If a termination claim is made, settlement shall be made in accordance with the contract. If there are no applicable termination provi-

(2) Revised to comply with the law.

[§ 103D–707] **Remedies after an award.**[28] If after an award it is determined that a solicitation or award of a contract is in violation of law, then the contract may be ratified and affirmed, provided it is determined that doing so is in the best interests of the State, or terminated and the payment of such damages, if any, as may be provided in this part or by regulation, in addition to any costs incurred on the contract prior to termination, may be allowed.

sions in the contract, settlement shall be made on the basis of actual costs directly or indirectly allocable to the contract through the time of termination. Such costs shall be established in accordance with generally accepted accounting principles. Profit shall be proportionate only to the performance completed up to the time of termination and shall be based on projected gain or loss on the contract as though performance was completed. Anticipated profits are not allowed.

(b) When there is fraud or bad faith by the contractor:

(1) Upon finding after award that a solicitation or award is in violation of law and the recipient of the contract acted fraudulently or in bad faith, the chief procurement officer or the head of a purchasing agency may, after consulting with the respective attorney general or corporation counsel, declare the contract void or ratify and affirm it in accordance with this section.

(2) The contract shall be declared void unless ratification and affirmation is found to be in the State's best interest under paragraph (3).

(3) The contract shall not be modified, ratified, and affirmed unless it is determined in writing that there is a continuing need for the goods, services, or construction under the contract and:

(A) There is no time to re-award the contract; or

(B) The contract is being performed for less than it could be otherwise performed.

(4) In all cases where a contract is voided, the State shall endeavor to return those goods delivered under the contract that have not been used or distributed. No further payments shall be made under the contract and the State is entitled to recover the greater of:

(A) The difference between payments made under the contract and the contractor's actual costs up until the contract was voided; or

(B) The difference between payments under the contract and the value to the State of the goods, services, or construction the State obtained under the contract.

(C) The State may in addition claim damages under any applicable legal theory.

(5) The State shall be entitled to any damages it can prove under any theory including, but not limited to, contract and tort regardless of its ratification and affirmation of the contract.

(6) If a state or county employee knowingly and willfully lets a contract contrary to

mined that a solicitation or award of a contract is in violation of law, then:

(1) If the person awarded the contract has not acted fraudulently or in bad faith:

(A) The contract may be ratified and affirmed, provided it is determined that doing so is in the best interests of the State; or

(B) The contract may be terminated and the person awarded the contract shall be compensated for the actual expenses reasonably incurred under the contract, plus a reasonable profit prior to the termination;

(2) If the person awarded the contract has acted fraudulently or in bad faith:

(A) The contract may be declared null and void; or

(B) The contract may be ratified and affirmed if the action is in the best interests of the State, without prejudice to the State's rights to such damages as may be appropriate.

*In re CARL Corp.*, 85 Hawai'i at 448–49, 946 P.2d at 18–19 (footnotes added; footnote omitted). The supreme court also noted that in determining whether ratification of an awarded contract is in the best interest of the State, the following factors, enumerated in HAR § 3–126–38(a)(4), should be considered:

(A) The costs to the State in terminating and resoliciting;

(B) The possibility of returning goods delivered under the contract and thus decreasing the costs of termination;

(C) The progress made toward performing the whole contract; and

(D) The possibility of obtaining a more advantageous contract by resoliciting.

*Id.* at 449, 946 P.2d at 19. The supreme court explained:

Thus, the award of the contract before it has been determined whether the solicitation or proposed award is in violation of law effectively limits the relief available to the person aggrieved by the solicitation or award. Where the contract has not yet been awarded, it is still possible to cancel the solicitation and proposed award, or to correct the violation. *Once the contract has been awarded, whether or not it is in violation of law, and notwithstanding the prejudice to the aggrieved person or the public, the contract may still be ratified, provided it is "in the best interests of the State." Moreover, the further performance on the contract has proceeded, the more likely it is, given the applicable factors, that ratification of the contract is "in the best interests of the State," effectively eliminating any remedy, either to the public or the protestor, from an illegally entered contract.*

*Id.* at 449, 946 P.2d at 19 (emphasis added).[29]

▮ In the instant case, the parties represented to this court during oral argument

---

law, that employee may be personally liable for his or her actions.

29. The Hawai'i Supreme Court explained that in some instances the award of attorney's fees to the prevailing protestor is justified:

The [Procurement] Code itself ... contains an inherent incentive for an agency to award the contract immediately upon receipt of a protest: it can avoid the delay and expense that would be incurred in the cancellation and resolicitation should the protestor prevail. In addition, there is a built-in disincentive for an aggrieved participant to pursue a protest past the agency stage once the contract has been awarded: regardless of whether it is successful in proving a violation of the code, and no matter how egregious the violation, the only potential relief available to the protestor is recovery of its bid preparation costs. Requiring such a protestor to bear its own attorney's fees strengthens the financial disincentive to

pursue a protest once the contract has been awarded, and essentially nullifies the most effective enforcement mechanism in the Code.

In the long term, this can only decrease competition among vendors. Moreover, if the procedural provisions of the Code are unenforceable except at the discretion of the prosecutor, the Code cannot "[i]ncrease public confidence in the integrity of the system" or, as it demonstrably failed to do in the instant case, "[p]rovide for fair and equitable treatment of all persons dealing with the government procurement system." Although the Code does not expressly authorize the award of attorney's fees under the circumstances of the instant case, interpreting HRS § 103D–704 to preclude such an award renders the Code incapable of furthering the purposes and policies that required its enactment.

We do not believe that the legislature intended this result. The remedy provisions of the procurement code were intended to encourage

that the contract for the Project has been awarded to Okada, which commenced performance under the contract several months ago. To order cancellation of BWS's contract with Okada and order BWS to award a new contract to Inter Island to complete the remaining work for the Project would not, in our view, be in the best interests of BWS and the public. Not only would the Project be delayed while Okada closed and Inter Island mobilized operations at the Project site, but the Project would be completed on a piecemeal basis, leading to accountability questions in the event problems ensued after the Project was completed. Moreover, Inter Island has already been awarded compensation "for actual expenses, if any, that were reasonably incurred under the contract and reasonable profit based upon any performance

the settlement of disputes "through administrative processes to save time and expense for both parties *while preserving all rights and maintaining fairness.*" Sen. Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal, at 39 (emphasis added). Fairness is not maintained, however, by shifting the economic burden of enforcing the Code to a protestor, who, because of bad-faith actions of the contracting official, has been deprived of any means of being made whole following fruitless participation in an unlawfully conducted procurement process.
*In re CARL Corp. v. State Dep't of Educ.*, 85 Hawai'i 431, 460, 946 P.2d 1, 30 (1997) (*CARL

on the contract up to the time of termination."

## CONCLUSION

In light of the foregoing discussion, we vacate the hearings officer's November 10, 1999 Decision. However, we deny Inter Island's request that we reinstate BWS's contract award to Inter Island and terminate BWS's contract award to Okada.

*I).* However, we find the supreme court's ruling inapposite to the instant case, where the contracting official did not act in bad faith. Instead, BWS properly awarded the Project contract to Inter Island, only to have the award reversed by the hearings officer. We conclude that in such an instance, it is unfair to penalize BWS and award attorney's fees to Inter Island. The supreme court subsequently classified the attorney's fees awarded in *Carl[CARL] I* as an "exceptional rule." *In re CARL Corp. v. State Dep't of Educ.*, 93 Hawai'i 155, 170, 997 P.2d 567, 582 (2000) (*CARL II*). We decline to award such an "exceptional" remedy in the instant case.