40 P.3d 73

**OKADA TRUCKING CO., LTD.,**
Petitioner–Appellee–
Petitioner,

v.

**BOARD OF WATER SUPPLY,** City and
County of Honolulu, Respondent–
Appellee–Respondent,

and

Inter Island Environmental Services,
Inc., Intervenor–Respondent–
Appellant–Respondent.

No. 22956.

Supreme Court of Hawai'i.

Jan. 28, 2002.

Reconsideration Denied Feb. 15, 2002.

James E.T. Koshiba and Neal K. Aoki, Honolulu, (of Koshiba Agena & Kubota) for the petitioner-appellee-petitioner Okada Trucking Co., Ltd., on the application for a writ of certiorari.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by LEVINSON, J.

We granted the application for a writ of certiorari filed by the petitioner-appellee-petitioner Okada Trucking Co., Ltd., [hereinafter, "Okada Trucking"], to review the published decision of the Intermediate Court of Appeals (ICA) in *Okada Trucking Co., Ltd. v. Board of Water Supply*, 97 Hawai'i 544, 40 P.3d 946 (Haw.Ct.App.2001) [hereinafter, the "ICA's opinion"].[1] In its opinion, the ICA held that the administrative hearings officer, who reviewed the decision of the respondent-appellee-respondent City and County of Honolulu Board of Water Supply [hereinafter, "the BWS"] to award a construction contract to the intervenor-respondent-appellant-re-

spondent Inter Island Environmental Systems, Inc., [hereinafter, "Inter Island"], erroneously determined that Inter Island was not a "responsible" bidder and had submitted a "non-responsive" bid in connection with an invitation for bids that the BWS had issued, pursuant to the Hawai'i Public Procurement Code, HRS ch. 103D (1993 & Supp.2000), in order to procure a contractor to construct a booster station.[2] ICA's opinion at 546, 40 P.3d at 948. According to the ICA, the hearings officer erroneously found that the project for which the BWS had invited bids required the use of a plumbing subcontractor who held a "C–37" specialty contracting license. *Id.* at 547, 40 P.3d at 949. Insofar as the project, in the ICA's view, did not entail work that would require the particular skills of a plumbing subcontractor who held a C–37 specialty license, the ICA held that Inter Island—which had neither named a C–37 licensed plumbing subcontractor in its bid nor described the nature and scope of the work that such a subcontractor would perform—had submitted the lowest responsive and responsible bid. *Id.* at 547, 40 P.3d at 949. Consequently, the ICA further held that the hearings officer had erroneously determined that the BWS should not have awarded the contract for the project to Inter Island. *Id.* On the basis of its analysis, the ICA "vacated" the hearing officer's findings of fact, conclusions of law, and order, but denied Inter Island the relief it had sought—*i.e.*, reinstatement of the BWS's award of the

1. The ICA's opinion was authored by the Honorable Corinne K.A. Watanabe and joined by Chief Judge James S. Burns and the Honorable Daniel R. Foley.

2. The Procurement Code applies "to all procurement contracts made by governmental bodies[.]" HRS § 103D–102(a) (Supp.2000). HRS § 103D–104 (Supp.2000) defines "governmental body" to include "the several counties of the State." HRS ch. 103D provides for review of the BWS's award of the construction contract by an administrative hearings officer and for judicial review of the hearings officer's decision. Pursuant to HRS § 103D–701 (Supp.2000), "[a]ny actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or award of a contract may protest to the chief procurement officer or a designee as specified in the solicitation." HRS § 103D–709(a) (1993) provides in relevant part that a "hearings officer ... shall have jurisdic-

tion to review and determine *de novo* any request from any bidder, offeror, contractor or governmental body aggrieved by a determination of the chief procurement officer[.]" Pursuant to HRS § 103D–709(b) (1993), the hearings officer "shall have the power to ... find facts, make conclusions of law, and issue a written decision[,] which shall be final and conclusive unless a person or governmental body adversely affected by the decision commences an appeal in the supreme court under [HRS § ] 103D–710 [ (1993 & Supp.2000) ]." HRS § 103D–710(a) (Supp. 2000) provides that "[o]nly parties to proceedings under [HRS § ] 103D–709 who are aggrieved by a final decision of a hearings officer under that section may apply for judicial review of that decision. The proceedings for review shall be instituted in the supreme court." Pursuant to HRS § 602–5(8) (1993) and Hawai'i Rules of Appellate Procedure (HRAP) Rule 31(a) (2000), we assigned the matter to the ICA.

project contract to it—because the ICA be- lieved that to do so would be in neither the BWS's nor the public's best interests. *Id.* at 567–68, 40 P.3d at 969–70.

For the reasons set forth below, we vacate the ICA's opinion and remand this matter to the ICA for consideration of the points of error raised by Inter Island in its appeal from the hearings officer's decision.

## I.  BACKGROUND

### A.  Factual Background

In May 1999, the BWS issued an invitation for bids, with accompanying documents [hereinafter, collectively, "the IFB"], in which it sought sealed bids for a project involving the construction of a booster station.  The IFB expressly required that all prospective bidders hold "a current A—General Engineering Contractor license."  The IFB further required that,

[t]o be eligible to bid, the prospective bidder must give separate written notice of his/her intention to bid together with certifications that he/she is licensed to undertake this project pursuant to Chapter 444, HRS, relating to the licensing of contractors, to the Director of Budget and Fiscal Services, City and County of Honolulu.

In essence, the BWS sought to procure a general contractor, holding an "A" general engineering contractor's license, who would "furnish[ ] and pay[ ] for all labor, tools, equipment and materials necessary for the installation" of the booster station; specifically, the task called for a qualified general engineering contractor to

install, in place complete, in accordance with plans and specifications, three pumping units and appurtenances; a pump/control building and appurtenances, including all mechanical and electrical work; site work; approximately 700 linear feet of 16–inch class 52 water main and appurtenances; an access road and appurtenances; and all incidental work.

During the administrative proceedings, no party disputed, and the hearings officer expressly found, that the project involved some work that would have to be performed by a plumbing subcontractor who held a C–37 specialty contracting license.[3]

As to those subcontractors whom the bidding contractor intended to engage in order to complete the project, the IFB expressly provided, in language similar to that contained in HRS § 103D–302(b) (Supp.2000) [4] and Hawai'i Administrative Rules (HAR) § 3–122–21(a)(8) (1997),[5] that the contractor

subcontractor in the performance of the contract and the nature and scope of the work to be performed by each.  Construction bids that do not comply with this requirement may be accepted if acceptance is in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is equal to or less than one per cent of the total bid amount.

**5.**  HAR § 3–122–21(a)(8) provides:

For construction projects the bidder shall provide:
(A) The name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the contract; and
(B) The nature and scope of the work to be performed by each.
Construction bids that do not comply with the above requirements may be accepted if acceptance is in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is equal to or less than one percent of the total bid amount.

**3.**  The IFB specified, as "Item No. 2," that the general engineering contractor awarded the contract would need to

[p]rovide and install booster pumping units within [the] booster station, inclusive . of pumps, motors, piping, fittings, valves, flow tube, transmitters, recorders, switches, gages, emergency pumping piping and connection, interior piping . . ., and appurtenances, in place complete, all in accordance with the plans and specifications, ready for use.
The hearings officer expressly found that "[a]t least a portion of the work described under Item No. 2 required the services of a duly licensed plumber with a C–37 specialty classification license for completion."

**4.**  HRS § 103D–302(b) provides:

An invitation for bids shall be issued, and shall include a purchase description and all contractual terms and conditions applicable to the procurement.  If the invitation for bids is for construction, it shall specify that all bids include the name of each person or firm to be engaged by the bidder as a joint contractor or

was required to disclose the name of, as well as the nature and scope of work to be undertaken by, the subcontractor:

> each bid for public works construction contracts shall include the name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the public works construction contract. The bid shall also indicate the nature and scope of work to be performed by such joint contractors or subcontractors. All bids which do not comply with this requirement may be rejected.

Nevertheless, the IFB—again reflecting the provisions of the Procurement Code and the administrative rules implementing its provisions, *see supra* notes 4 and 5—further provided that "where the value of the work to be performed by the joint contractor or subcontractor is equal to or less than one percent of the total bid amount, the listing of the joint contractor or subcontractor may be waived if it is in the best interest of BWS."

To assist the bidding contractor, the IFB included a form for the bidding contractor to complete as relevant, which enumerated each type of specialized work with respect to which a subcontractor could hold a classification "C" specialty contractor's license. Other than providing that the bidding contractor must hold a classification "A" general engineering contractor's license and that the project involved specialty work in the areas of pavement restoration (which would have had to be performed by an asphalt and paving contractor holding a C–3 specialty contractor's license) and water chlorination (which would have had to be performed by a water chlorination contractor holding a C–37d specialty contractor's license), the IFB did not expressly identify what other specialty work the project involved.

After the BWS opened the sealed bids and determined that Inter Island had submitted the lowest bid, it contacted Inter Island in connection with its failure to disclose the name of and the nature and scope of work to be performed by a C–37 licensed plumbing subcontractor, as well as several other speciality subcontractors that the project would require.[6] In response, Inter Island asserted that it "did not list subcontractors for the plumbing and installation of the pumps as their quotes were considerably below 1% or \$13,500.[00]" of its bid. Inter Island believed that the disclosure requirement did "not require[it] to list subcontractors [whose estimates of the cost of the work they would perform on the project were] under 1%." To verify its assertion that the work to be performed by each of the undisclosed subcontractors amounted to less than one percent of its bid, Inter Island transmitted to the BWS several estimates that it had received from the undisclosed subcontractors, each of which in fact fell below one percent of the bid that Inter Island had submitted to the BWS. However, the estimate that Inter Island obtained from a plumbing subcontractor to "[i]nstall [b]uilding [p]ump [p]iping in accordance with plans & specifications," bore the a date of June 22, 1999, which was twelve days after the "bid-opening" date of June 10, 1999.[7] Thereafter, on July 28, 1999, the BWS awarded the project contract to Inter Island.

Pursuant to HRS § 103D–701, *see supra* note 2, on August 4, 1999, Okada Trucking, which had submitted the second lowest bid on the project, filed a protest of the BWS's award of the project contract to Inter Island with the BWS's chief procurement officer. Okada Trucking asserted that the contract "should not have been awarded to [Inter Island] because it [had] not demonstrated

---

6. Specifically, the other subcontractors that Inter Island neglected to list in its bid were a C–42 licensed roofing subcontractor and a C–47 licensed reinforcing steel subcontractor. The only subcontractors that Inter Island listed in its bid were a C–3 licensed asphalt and paving subcontractor, a C–33 licensed painting and decorating subcontractor, and a C–37d licensed water chlorination subcontractor.

7. The plumbing subcontractor's estimate was \$8,300.00, conditioned upon Inter Island "supply[ing] all materials, and pipefitters to assist [the plumbing subcontractor's] plumbers while on jobsite." Inter Island received an estimate from a C–42 speciality roofing subcontractor on June 10, 1999, in the amount of 12,500.00. Similarly, Inter Island received an estimate from a C–47 speciality contractor to do reinforcing steel work on June 9, 1999, in the amount of \$8,675.00.

that it is qualified and/or capable of completing the contract." More specifically, Okada Trucking contended that: (1) "approximately" fifteen percent of the work required by the project involved "certain specialty work, such as plumbing," which could only be performed by a C–37 licensed subcontractor; however, (2) in contravention of HRS § 103D–302(b) (1993), *see supra* note 4, Inter Island had not disclosed the name of or the nature and scope of work to be performed by the C–37 licensed subcontractor it intended to use; and, thus, (3) the project contract should not have been awarded to Inter Island. Moreover, Okada Trucking contended that, in any event, even if the plumbing work required by the project amounted to less than one percent of Inter Island's bid, it was not in the BWS's best interest to waive the requirement that Inter Island disclose the subcontractors it intended to use to complete the project. The BWS denied Okada Trucking's protest, *inter alia*, because it was within the BWS's discretion to waive the disclosure requirement in the event, as Inter Island had verified, the work to be performed by a subcontractor was less than one percent of Inter Island's bid.[8]

### B. *Administrative Review*

Subsequently, pursuant to HRS § 103D–709, *see supra* note 2, Okada Trucking requested administrative review of the BWS's denial of its protest. By stipulation, Inter Island was allowed to intervene in the administrative proceedings. Okada Trucking contended, *inter alia*, that Inter Island's bid was "non-responsive" because it failed to disclose the name of and the nature and scope of

work to be performed by a duly licensed plumbing subcontractor.[9]

The hearings officer noted that the parties were not "disput[ing] the need for the performance of work by subcontractors with [a] speciality classification license[ ] in plumbing (C–37)[.]" The hearings officer further noted, pursuant to HRS § 103D–302(b) and HAR § 3–122–21(a)(8), *see supra* notes 4 and 5, that Inter Island's failure to disclose a duly licensed plumbing subcontractor rendered its bid "non-responsive," which, in fact, the parties did "not dispute[ ]." Rather, the essence of the dispute between the parties was whether the non-responsive aspect of Inter Island's bid was fatal or waivable by the BWS. According to Inter Island, it was not required to identify a subcontractor at all, if the amount of work that the subcontractor would perform amounted to less than one percent of Inter Island's total bid and the BWS subsequently determined that it was in its own best interest to waive the disclosure requirement. On the other hand, Okada Trucking maintained (1) that Inter Island was required to disclose each subcontractor it intended to engage in order to complete the project, which, *a fortiori*, necessitated that Inter Island obtain estimates for such speciality work prior to "bid-opening," [10] and, in any event, (2) that it was not in the BWS's best interest to waive the disclosure requirement.

The hearings officer determined that Inter Island was obligated to identify all subcontractors it would engage in order to complete the project and, as a consequence, that Inter Island had submitted a "non-responsive bid." Pursuant to HAR § 3–122–97(a)(2) (1997),[11]

---

8. The BWS also denied Okada Trucking's protest on the basis that it was untimely.

9. Okada Trucking also contended that it had timely filed its protest with the BWS. The hearings officer determined that Okada Trucking had timely filed its protest. On judicial appellate review of the hearings officer's decision, Inter Island has not challenged that aspect of the hearings officer's decision.

10. Okada Trucking appears to have argued that Inter Island's bid was both "non-responsive" for failing to disclose the requisite plumbing subcontractor, insofar as the bid did not conform to the IFB's requirements, and "non-responsible," insofar as it did not reflect that Inter Island could

lawfully complete the project (having failed to list a subcontractor who could perform the necessary plumbing work).

11. HAR § 3–122–97(a) provides in relevant part:
   Bids shall be rejected for reasons including but not limited to:
   (1) The bidder that submitted the bid is nonresponsible as determined by subchapter 13; [or]
   (2) The bid is not responsive, that is, it does not conform in all material respects to the invitation for bids under the provisions of subchapter 13.
   "Subchapter 13," HAR §§ 3–122–108 through 3–122–110 (1997), generally pertains to bidder responsibility.

the hearings officer concluded that the BWS had no choice but to reject the bid unless, pursuant to HRS § 103D–302(b) and HAR § 3–122–21(a)(8), *see supra* notes 4 and 5, "it waived the non-responsive aspect of [Inter Island's] bid" on the basis that "acceptance [of the bid] would be in [its] best interest[.]" However, addressing Okada Trucking's contention that the BWS had abused its discretion in determining that its best interests would be served by accepting Inter Island's bid, the hearings officer ruled that the IFB's requirement that each prospective bidder "must be capable of performing the work for which the bids [were] being" invited "subsume[d a requirement that] the bidder, at the time of bid submission and no later than bid opening date, was ready and able to perform the work required on the construction project if awarded the contract." Accordingly, the hearings officer concluded that not only was Inter Island's bid "non-responsive," but also that, in failing to have a duly licensed plumbing subcontractor "lined up," Inter Island "was not a responsible bidder." The hearings officer noted that bidder responsibility, if lacking at "bid-opening," could thereafter be remedied, but that bid responsiveness could not. As such, the hearings officer believed that the BWS had violated "provisions of the Procurement Code" by allowing Inter Island "to rectify its failure by obtaining a plumbing subcontractor *after* bid opening." (Emphasis in original.) The hearings officer therefore concluded that it was not in the BWS's or the public's best interests to have waived the disclosure requirement. Accordingly, the hearings officer terminated the contract between the BWS and Inter Island and awarded Inter Island compensation for any actual expenses it had reasonably incurred under the contract, as well as a reasonable profit based upon any performance it had already undertaken on the contract.

## C. *Application For Judicial Review*

Pursuant to HRS § 103D–710, *see supra* note 2, Inter Island applied to this court for judicial review of the hearings officer's decision. In its present appeal, Inter Island has not, expressly or impliedly, challenged the hearings officer's finding that the project required some work that would have to be performed by a duly licensed plumbing subcontractor. Rather, Inter Island challenges the hearings officer's determinations that it had submitted a non-responsive bid, that it was not a responsible bidder, and that it was not in the BWS's best interest to waive the disclosure requirement with regard to Inter Island's failure to identify a duly licensed plumbing subcontractor.[12] Inter Island asserts, in essence, that "[t]he principal issue [before the ICA was] whether the [h]earings [o]fficer incorrectly found that it was unlawful under the Procurement Code for the BWS to determine that it was in its best interest to waive the subcontractor listing requirement and allow Inter Island to obtain a written commitment from a plumbing subcontractor after bid opening." Inter Island correctly observes that the issue is one of statutory interpretation—*i.e.,* whether, under the relevant provisions of the Procurement Code and ancillary administrative rules and regulations, a failure to list a subcontractor whose work would amount to less than one percent of a submitted bid renders (1) the

---

**12.** Specifically, Inter Island challenges the hearings officers conclusions regarding: (1) the responsiveness of its bid, arguing that they were in error because HRS § 103D–302(b) does not require a procuring agency to reject a general contractor's bid for failure to list a subcontractor with whom the general contractor is not contractually bound when that subcontractor would perform work valued at less than [one percent] of the total bid amount and the procuring agency determined that it would be in its best interest to waive the subcontractor listing requirement[;]
(2) Inter Island's responsibility as a bidder, arguing that they were "in error because such conclusions ... defeat[ed] the purpose of, and

eliminate[d] a procuring agency's use of the *de minimis* listing exception provided for in HRS § 103D–302(b) and responsibility may be determined after bid opening and prior to award [of the contract;]" and (3) the BWS's best interest, arguing that they were
in error because the Procurement Code does not mandate that a bidder be contractually bound to all of its subcontractors at bid opening and there was no evidence introduced at the hearing to suggest that the anti-bid shopping policy behind the listing requirement was violated by the BWS's exercise of its statutory right to waive this subcontractor listing requirement.

bid materially non-responsive, such that it cannot be cured after bid-opening or waived by the procuring agency and (2) the bidder non-responsible, subject to cure after bid-opening or waiver by the procuring agency if it is in the public's best interests to do so.

Inter Island maintains that the applicable statutes and administrative rules are unambiguous. Quoting HRS § 103D–104 (1998), Inter Island notes that "a '[r]esponsive bidder' [means] 'a person who has submitted a bid which conforms in all *material* respects to the invitation for bids.' " (Emphasis added.) Thus, according to Inter Island, "[o]nly if the deficiency in the bid is *material*, is the bid non-responsive." (Emphasis in original.) As support for its position, Inter Island, cites, *inter alia*, *Southern Foods Group, L.P. v. State of Hawai'i Dept. of Educ.*, 89 Hawai'i 443, 456, 974 P.2d 1033, 1046 (1999), for the proposition that "deviations from bid specifications may be waived by the contracting officer[,] provided that the[deviation] do[es] not go to the substance of the bid or work an injustice on other bidders." Inter Island urges that a "substantial deviation" is one that "affects either the price, quantity, or quality of the articles [or services] offered." In Inter Island's view, the waiver provision set forth in HRS § 103D–302(b), *see supra* note 4, simply codifies the foregoing principle, essentially providing that the procuring agency may waive immaterial or "*de minimis*" defects that, *a fortiori*, do not substantially affect a submitted bid or the articles and services offered by the bidder. Thus, Inter Island urges that it submitted a responsive bid because, to the extent that the bid deviated from the IFB, it did so only in immaterial and insubstantial respects that did not affect the price or quality of its performance under the project contract.

### D. *The ICA's Opinion*

The ICA's opinion did not address Inter Island's points of error on appeal. Rather, after generally discussing bid responsiveness and bidder responsibility, *see* ICA's opinion at 555–58, 40 P.3d at 957–60, the ICA noted that the "correctness" of the hearings officer's determinations that Inter Island's bid

was nonresponsive and that it was not a responsible bidder "depends . . . on whether Inter Island was required by the IFB and applicable statutes or rules to use and list subcontractors in the three speciality classifications to perform work under the contract," *id.* at 558, 40 P.3d at 960. The ICA then discussed the legislative history of the subcontractor disclosure requirement codified in HRS § 103D–302(b), *see id.* at 558–60, 40 P.3d at 960–62, reviewed the hearings officer's reasoning with respect to its conclusion that Inter Island's bid was non-responsive, *see id.* at 560–62, 40 P.3d at 962–64, and agreed with the hearings officer that the subcontractor disclosure requirement reflected the legislature's intent to prevent a general contractor's "bid shopping" or "bid peddling" in connection with procuring subcontractors to perform a given public works contract, *see id.* at 562, 40 P.3d at 964. Nevertheless, the ICA "conclude[d] that the hearings officer was wrong in holding that Inter Island was required to list in its bid subcontractors with a 'C–37' plumbing, [a] 'C–41' reinforcing steel, and [a] 'C–42' roofing specialty license." *Id.* at 562, 40 P.3d at 964. According to the ICA, HRS § 103D–302(b), *see supra* note 4, as well as HAR § 3–122–21(a)(8), *see supra* note 5, which the IFB incorporated by reference, only required that prospective bidders disclose "those subcontractors who are '*to be engaged* by the bidder' " to complete the project. *Id.* at 562, 40 P.3d at 964 (emphasis in original). Thus, the ICA believed that "if a contractor does not plan to use a subcontractor in the performance of the contract, and the contractor is not required by statute, rule, or the IFB to use a joint contractor or subcontractor to perform portions of the contract,[ ] the contractor is not required to list any joint subcontractor." *Id.* at 562, 40 P.3d at 964 (footnote—noting that the IFB expressly required only the use of duly licensed asphalt and paving and water chlorination subcontractors—omitted).

The ICA held *sua sponte*, however, that the hearings officer "was wrong" in determining that the nature of the project required Inter Island to subcontract any plumbing, roofing, and reinforcing steel spe-

cialty work that the project would necessitate. *See id.* at 562–63, 40 P.3d at 964–65. In the ICA's view, by virtue of holding an "A" general engineering contractor's license and a "B" general building contractor's license, both of which automatically qualified the holder to engage in specific class "C" specialty work (but not the specialty work at issue in the present matter), Inter Island was vested with "broad contracting authority." *See id.* at 563, 40 P.3d at 965. After parsing the statutes and administrative rules regarding licensing, the ICA remarked that

> an "A" contractor is authorized to generally undertake all contracts to construct fixed works requiring specialized engineering knowledge and skill in a wide range of subject areas, including water power, water supply, and pipelines. A "B" contractor is authorized to undertake contracts to construct structures requiring "the use of more than two unrelated building trades or crafts, or to do or superintend the whole. or any part thereof." An "A" and "B" contractor is prohibited, however, from undertaking work solely in a specialty contracting area, unless the contractor holds a specialty license in that area.

*Id.* at 563–64, 40 P.3d at 965–66. Thus, the ICA held that Inter Island "was authorized to undertake the [p]roject with its own staff,[ ] provided, of course, that where certain work required performance by individuals with particular licenses, Inter Island utilized employees who were appropriately licensed to perform such work." *Id.* at 564, 40 P.3d at 966. In reaching its holding, the ICA necessarily held *sub silentio,* as a matter of plain error, that the hearings officer had clearly erred in finding that the project involved work that was required to be performed by a C–37 licensed subcontractor, as well as by duly licensed roofing and reinforcing steel subcontractors. *Id.*

Because the ICA believed that Inter Island was not required to engage such specialty subcontractors to perform the contract, it did not address Inter Island's contention that the hearings officer erred in determining that the BWS had violated the Procurement Code

in waiving Inter Island's failure to list specialty plumbing, roofing, and reinforcing steel subcontractors. *Id.* at 564–65, 40 P.3d at 966–67. Finally, even though Inter Island prevailed on the merits, the ICA, relying on *In re CARL Corp.,* 85 Hawai'i 431, 946 P.2d 1 (1997), further held that Inter Island was not entitled to the relief it sought—*i.e.,* reinstatement of the terminated contract—because, as the parties represented at oral argument, the contract had been awarded to Okada Trucking, which had, at that time, been performing on the contract for "several months." *Id.* at 567–68, 40 P.3d at 967–70. As such, the ICA believed that it would not be in either the BWS's or the public's best interests to terminate Okada Trucking's contract with the BWS and to reinstate the original contract between Inter Island and the BWS. *Id.* at 568, 40 P.3d at 970. The ICA therefore "vacate[d]" the hearing officer's decision, but "den[ied] Inter Island's request that [it] reinstate BWS's contract award to Inter Island and terminate BWS's contract award to Okada [Trucking]." *Id.* at 568, 40 P.3d at 970.

### E. *Application For Certiorari*

Okada Trucking applied to this court for a writ of certiorari to review the ICA's opinion. In its application, Okada Trucking contended that the ICA "erred in concluding" (1) that the project did not involve some specialty work requiring the use of a duly licensed plumbing subcontractor and (2) that Inter Island was not required to list such a subcontractor in its bid. Accordingly, Okada Trucking urges that the ICA's opinion (1) contains a grave error of law, insofar as the ICA concluded that Inter Island was vested with "broad contracting authority" by virtue of holding a classification "A" general engineering contractor's license and a classification "B" general building contractor's license and, thus, was not obligated to engage specialty contractors to perform specialty work, such as plumbing, with respect to the project contract and (2) contains a grave error of fact, insofar as the ICA found that the project did not involve specialty work that would

require Inter Island, *inter alia,* to engage a duly licensed plumbing subcontractor.

## II. *STANDARDS OF REVIEW*

### A. *Review Of The ICA's Decision*

Pursuant to HRS § 602–59(b) (1993), our review of a decision of the ICA is limited, *inter alia,* to "grave errors of law or fact," which are of such a "magnitude" as to "dictat[e] the need for further appeal." *See, e.g., In re Jane Doe, Born On June 20, 1995,* 95 Hawai'i 183, 189, 20 P.3d 616, 622 (2001).

### B. *Statutory Interpretation*

■ "The interpretation of a statute is a question of law reviewable *de novo." Id.* at 190, 20 P.3d at 623 (citations, internal quotation signals, ellipsis points, and brackets omitted).

## III. *DISCUSSION*

■ At no point in its opinion did the ICA acknowledge, expressly or impliedly, that it was reviewing, *sua sponte* and as a matter of plain error, the hearing officer's uncontested factual finding that the project entailed some work that had to be performed by a duly licensed plumbing subcontractor. Findings of fact, however, that are not challenged on appeal are binding on the appellate court. *See, e.g., Taylor–Rice v. State,* 91 Hawai'i 60, 65, 979 P.2d 1086, 1091 (1999) (noting that, in failing to challenge any of the trial court's findings of fact, the State had waived any challenge to those findings and, thus, that they were binding on appeal and citing *Kawamata Farms, Inc. v. United Agri Products,* 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997), for the proposition that "[i]f a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid"); *cf. Burgess v. Arita,* 5 Haw.App. 581, 704 P.2d 930 (1985) ("[u]nchallenged findings of fact are binding upon the appellant"). Moreover, insofar as an administrative hearings officer possesses expertise and experience in his or her particular field, the appellate court "should not substitute its own judgment for that of the agency" either with respect to questions of fact or mixed questions of fact

and law. *Southern Foods Group, L.P.,* 89 Hawai'i at 452, 974 P.2d at 1042 (quoting *Dole Hawaii Division–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990)). Rather, even those factual findings, as well as conclusions of law that involve mixed questions of fact and law, which are challenged on appeal from the decision of an administrative hearings officer based on the Hawai'i Public Procurement Code, are entitled to deference and, as such, will not be reversed unless they are "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." *Id.* (quoting *Arakaki v. State, Dep't of Accounting and Gen. Serv.,* 87 Hawai'i 147, 149–50, 952 P.2d 1210, 1212–13 (1998)); *see also* HRS § 103D–710(e)(5) (1993).

■ In connection with addressing plain error, we have often remarked that the "[t]he plain error doctrine represents a departure from the normal rules of waiver that govern appellate review," *see, e.g., Montalvo v. Lapez,* 77 Hawai'i 282, 291, 884 P.2d 345, 354 (1994), and, as such, that an appellate court should invoke the plain error doctrine in civil cases "only ... when justice so requires," *id.* at 290, 884 P.2d at 354 (quoting *State v. Fox,* 70 Haw. 46, 56 n. 2, 760 P.2d 670, 676 n. 2 (1988) (some citations omitted) (internal quotation signals omitted)). As such, the appellate court's discretion to address plain error is always to be exercised sparingly. *See, e.g., State v. Aplaca,* 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001). And, indeed, in civil cases,

> [w]e have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised[:] (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

*Montalvo,* 77 Hawai'i at 290, 884 P.2d at 353 (citations omitted).

■ Our reluctance to reach plain error in civil cases is especially heightened in an appeal from an administrative proceeding with respect to questions of fact or mixed questions of fact and law that neither party

has challenged at any point in the proceedings. As we have noted, unchallenged factual findings are deemed to be binding on appeal, which is to say no more than that an appellate court cannot, under the auspices of plain error, *sua sponte* revisit a finding of fact that neither party has challenged on appeal.

■ In light of the foregoing, the ICA erred in holding *sua sponte* that the hearings officer "was wrong" in determining that the nature of the project required Inter Island to subcontract with a duly licensed plumbing subcontractor, thereby holding, *sub silentio*, that the hearings officer had plainly and clearly erred in finding that it did. The question then becomes whether the ICA further erred in holding that, pursuant to the applicable statutes and administrative rules, Inter Island, which did not possess the requisite *speciality* contracting license in plumbing, could, by virtue of the *general* contracting licenses it did hold, lawfully perform the specialty work that the project required without engaging a duly licensed specialty plumbing contractor.

HRS ch. 444 (1993 & Supp.2000) creates a contractors license board [hereinafter, "the board"], *see* HRS § 444–3 (1993), which is vested with broad authority over contractor licensing; the general purpose of HRS ch. 444 "is the protection of the general public." HRS § 444–4(2) (Supp.2000). By statute, the board is directed to adopt such rules as it deems proper fully to implement its authority and to enforce the provisions of HRS ch. 444 and the rules adopted pursuant thereto. *See* HRS §§ 444–4(2), (3), and (4). The board also grants, suspends, and revokes contractors' licenses and oversees the examination of applicants to ensure that contractors are qualified to undertake the work for which they are licensed. *See* HRS § 444–4(1), (5), (7), and (8).

HRS § 444–7(a) (1993) provides that, "[f]or the purposes of classification, the contracting business includes any or all of the following branches: (1)[g]eneral engineering contracting; (2)[g]eneral building contracting; [and] (3)[s]pecialty contracting." As such, pursuant to its rules, the board has classified the types of licenses it issues as (1) general engineering contractor (classification "A"), (2) general building contractor (classification "B"), and (3) specialty contractor (classification "C"). *See* HAR §§ 16–77–28(a) (1988) and 16–77–32 through 16–77–35 (1988). Classification "C" includes numerous specific licenses, each of which pertains to the particular trade or craft in which the applicant has the requisite expertise. *See* HAR, title 16, chapter 77, exhibit A (1988). For example, a "C–6" license pertains to "carpentry framing," a "C–13" license pertains to "electrical" work, and so on. *Id.*

HRS § 444–7 generally describes the principal business activity of each of the three contracting "branches." "A general engineering contractor is a contractor whose principal contracting business is in connection with fixed works requiring specialized engineering knowledge and skill[.]" HRS § 444–7(b). The legislature has determined that a general engineering contractor's knowledge and skill includes

> the following divisions or subjects: irrigation, drainage, water power, water supply, flood control, inland waterways, harbors, docks and wharves, shipyards and ports, dams and hydroelectric projects, levees, river control and reclamation works, railroads, highways, streets and roads, tunnels, airports and airways, sewers and sewage disposal plants and systems, waste reduction plants, bridges, overpasses, underpasses and other similar works, pipelines and other systems for the transmission of petroleum and other liquid or gaseous substances, parks, playgrounds and other recreational works, refineries, chemical plants and similar industrial plants requiring specialized engineering knowledge and skill, powerhouses, power plants and other utility plants and installations, mines and metallurgical plants, land levelling and earth-moving projects, excavating, grading, trenching, paving and surfacing work and cement and concrete works in connection with the above mentioned fixed works.

*Id.* Elaborating upon the foregoing determination, the board has determined, by virtue of the "A" classification, that a duly licensed

## 460

general engineering contractor "automatically hold[s]" sixteen classification "C" specialty licenses. HAR § 16–77–32(a). However, a global C–37 specialty license is not among those that a general engineering contractor automatically holds. *Id.*[13]

A general building contractor

is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof.

HRS § 444–7(c). Like a general *engineering* contractor, a general *building* contractor, duly holding a classification "B" license, "automatically holds" a number of classification "C" specialty licenses, but a C–37 specialty plumbing license is not among them.[14] HAR § 16–77–32(c).

Finally, a specialty contractor "is a contractor whose operations as such are the performance of construction work requiring special skill such as, but not limited to, electrical, ... plumbing, or roofing work, and others whose principal contracting business involves the use of specialized building trades or crafts." HRS § 444–7(d). Insofar as the board has, with regard to classification "C" specialty licensing, subclassified particular trades or crafts (such as C–37 plumbing, which includes five subdivisions), it has fur-

ther determined that "[l]icensees who hold a specialty contractors license shall automatically hold the subclassifications of the licensee's particular specialty without examination or paying additional fees." HAR § 16–77–32(d).

However, pursuant to HRS § 444–9 (1993), "[n]o person within the purview of [HRS ch. 444] shall act, or assume to act, or advertise, as [a] general engineering contractor, [a] general building contractor, or [a] specialty contractor without a license previously obtained under and in compliance with [HRS ch. 444] and the rules and regulations of the contractors license board." *See also* HAR § 16–77–4(a) (1988) (same). Thus, absent, for example, a global C–37 specialty plumbing license, neither a general engineering contractor (despite the fact that it automatically holds specialty licenses in two subclassifications of plumbing, *see supra* note 13) nor a general building contractor can act as a C–37 specialty plumbing contractor. In other words, a general engineering contractor cannot perform specialized work for which it is not, automatically or otherwise, duly licensed and which it lacks the requisite specialized skill to undertake. Accordingly, although a general engineering contractor possesses a broad range of knowledge and experience that renders it competent to undertake particular specialty work that is subsumed within its classification "A" general engineering contractor's license, that range does not extend, in the view of the board, to the "special

---

**13.** The enumerated specialties in which a general engineering contractor is automatically qualified to undertake work, "without further examination or paying additional fees," are: (1) C–3, asphalt paving and surfacing; (2) C–9, cesspool; (3) C–17, excavating, grading, and trenching; (4) C–24, building moving and wrecking; (5) C–31a, cement concrete; (6) C–32, ornamental guardrail and fencing; (7) C–35, pile driving, pile and caisson drilling, and foundation; (8) C–37a, sewer and drain line; (9) C–37b, irrigation and lawn sprinkler systems; (10) C–38, post tensioning; (11) C–43, sewer, sewage disposal, drain, and pipe laying; (12) C–49, swimming pool; (13) C–56, welding; (14) C–57a, pumps installation; (15) C–57b, injection wall; and (16) C–61, solar energy systems. HAR § 16–77–32(a). The board has further determined that a general engineering contractor

may also install poles in all new pole lines and replace poles, provided that installation of the

ground wire, insulators, and conductors are performed by a contractor holding the C–62 pole and line classification. The "A" general engineering contractor may also install duct lines, provided that installation of conductors is performed by a contractor holding the C–13 [electrical] classification.

HAR § 16–77–32(b).

**14.** Specifically, a general building contractor, by virtue of its classification "B" license, automatically holds, "without further examination or paying additional fees," seven "C" specialty licenses: (1) C–5, cabinet, millwork, and carpentry remodelling and repairs; (2) C–6, carpentry framing; (3) C–12, drywall; (4) C–24, building moving and wrecking; (5) C–25 institutional and commercial equipment; (6) C–42a, aluminum shingles; and (7) C–42b, wood shingles and shakes. HAR § 16–77–32(c).

skill" requisite to undertake global C–37 specialty plumbing work. Indeed, a contrary result would eviscerate the board's express enumeration of the particular specialty licenses that a general engineering contractor "automatically holds," due to its experience, knowledge, and skill. Thus, if a particular project for which a general engineering contractor has obtained a contract requires work in a specialty classification in which it is not licensed to operate ("automatically" or otherwise), the general engineering contractor cannot, pursuant to HRS § 444–9, undertake to perform that specialty work itself.[15] Rather, only a duly licensed specialty contractor can undertake to complete the requisite specialty work.[16]

15. We do not reach the question whether, if an employee of the general engineering contractor holds a specialty license, the general engineering contractor can, without subcontracting with that employee, simply utilize that employee to perform any requisite specialty work in that employee's area of expertise, as the ICA appears to have held. See ICA's opinion at 564, 40 P.3d at 966. The record is devoid of any evidence that reflects whether any of Inter Island's employees held specialty licenses at all, and we will not speculate on the matter. Similarly, we note that whether Inter Island holds a "B" classification license in general building contracting is similarly irrelevant; a classification "B" general building contractor does not, as noted above, hold the requisite C–37 specialty plumbing license at issue in the present matter. As such, our reasoning with respect to a general engineering contractor's competence to perform C–37 specialty plumbing work applies with equal force to a general building contractor.

16. That HRS § 444–8(c) (1993) provides, in essence, that a specialty contractor may engage in work that requires utilization of a craft or trade other than that in which it is licensed if the utilization of that other craft or trade is "incidental and supplemental" to the specialty contractor's work in the field in which it is licensed does not affect our holding. In full, HRS § 444–8 provides as follows:

(a) The contractors license board may adopt rules and regulations necessary to effect the classifications of contractors in a manner consistent with established usage and procedure as found in the construction business, and may limit the field and scope of the operations of a licensed contractor to those in which the contractor is classified and qualified to engage, as defined in [HRS § ] 444–7.

(b) A licensee may make application for classification and be classified in more than one classification if the licensee meets the qualifications prescribed by the board for such additional classification or classifications. For qualifying or classifying in additional classifications, the licensee shall pay the appropriate application fee but shall not be required to pay any additional license fee.

(c) This section shall not prohibit a specialty contractor from taking and executing a contract involving the use of two or more crafts or trades, if the performance of the work in the crafts or trades, other than in which the specialty contractor is licensed, is incidental and supplemental to the performance of work in the craft for which the specialty contractor is licensed.

Consistent with HRS §§ 444–8 and 444–9, the board has limited the scope of work in which a classification "A" or "B" licensee may engage as follows: "[a] licensee classified as an 'A' general engineering contractor or as a 'B' general building contractor shall not act, assume to act, or advertise as a specialty contractor except in the specialty classifications which the licensee holds." HAR § 16–77–33(a). A general building contractor is even further limited in the scope of work it may undertake, insofar as a classification "B" license

does not entitle the holder to undertake a contract unless it requires more than two unrelated building trades or crafts or unless the general building contractor holds the specialty license to undertake the contract. Work performed which is incidental and supplemental to one contractor classification shall not be considered as unrelated trades or crafts.

HAR § 16–77–33(b). The board has defined "incidental and supplemental" to mean "work in other trades directly related to and necessary for the completion of the project undertaken by a licensee pursuant to the scope of the licensee's license." HAR § 16–77–34. Nevertheless, "[a]ny licensee who acts, assumes to act, or advertises in any classification other than [that] for which the licensee is duly licensed ... shall be construed to be engaged in unlicensed activity." HAR § 16–77–33(d).

The foregoing provisions, to the extent that they permit a specialty contractor to engage in "incidental and supplemental" work in trades or crafts in which it is not licensed do not similarly expand the scope of work in which a general engineering contractor may engage. Rather, as to general engineering contractors, HRS §§ 444–8 and 444–9, as well as HAR §§ 16–77–32 through 16–77–34, expressly constrain them from engaging in any operations for which they are not duly licensed.

More importantly, however, in the present matter, no party has ever contended that Inter Island could undertake the plumbing work required by the project because that work was "incidental and supplemental" to work that Inter Island was duly licensed to undertake. Inasmuch as we are not fact-finders and given that the hearings officer expressly found that the project required work in the C–37 plumbing classification, the ICA erred in construing the foregoing

It is therefore apparent that the ICA erred in holding that the applicable statutes and administrative rules merely prohibit a general engineering or building contractor from "undertaking work *solely* in a specialty contracting area, unless the contractor holds a specialty license in that area." ICA's opinion at 564, 40 P.3d at 966 (emphasis added). Rather, as discussed above, pursuant to HRS § 444–9, a general engineering or building contractor is prohibited from undertaking *any* work, solely or as part of a larger project, that would require it to act as a specialty contractor in an area in which the general contractor was not licensed to operate. Thus, to the extent that the project required plumbing work classified as C–37 specialty work, Inter Island, which does not hold a C–37 specialty license, could not undertake to act in that area. It therefore follows that Inter Island would need to obtain a subcontractor duly licensed in the C–37 plumbing classification to undertake such work in order to complete the project. Consequently,

we hold that the ICA erred, in both law and fact, in reversing [17] the hearing officer's decision on the ground that the project did not require work in the C–37 plumbing classification and that Inter Island did not, consequently, need to engage a specialty contractor holding a C–37 specialty license in order to complete the project.

## IV. CONCLUSION

In light of the foregoing, we vacate the ICA's opinion and remand this matter to the ICA for it to consider the points of error that Inter Island raises on appeal from the hearing officer's decision.[18]

provisions to support its holding that the project in the present matter did not require specialized plumbing work that Inter Island was not duly licensed to undertake. *See* ICA's opinion at 562–64, 40 P.3d at 964–66.

17. Although the ICA purported to "vacate" the hearings officer's decision, it actually "reversed" it, at least insofar as it overturned the hearings officer's disposition of the present matter and did not remand the matter for further proceedings.

18. Bearing in mind that our statutory review of the ICA's decision is limited to the alleged "grave" error contained therein, remand to the

ICA is appropriate in this case. Ordinarily, the error alleged in a decision of the ICA lies in the ICA's analysis of the points of error raised on appeal. In such cases, we necessarily reach the merits of the ICA's substantive analysis of those points of error. In the present matter, however, the ICA's alleged error includes its failure to address the points of error that Inter Island advanced on appeal. Accordingly, our holding that the ICA erred in its *sua sponte* disposition of this case on a factual and legal basis that was not presented to it on appeal does not address the merits of Inter Island's points of error either. It is the prerogative of the ICA to do so in the first instance.